198 Pa. Superior Ct. 618 (1962)
Penn Sheraton Hotel et al., Appellants,
v.
Pennsylvania Public Utility Commission.
Superior Court of Pennsylvania.
Argued April 12, 1962.
September 13, 1962.
*620 Before RHODES, P.J., ERVIN, WRIGHT, WOODSIDE, WATKINS, MONTGOMERY, and FLOOD, JJ.
Harry A. Kramer, for appellants.
Albert D. Brandon, Assistant City Solicitor, with him David W. Craig, City Solicitor, for City of Pittsburgh, appellant.
Miles Warner, Assistant Counsel, with him Joseph I. Lewis, Chief Counsel, for Pennsylvania Public Utility Commission, appellee.
Charles E. Thomas, with him Lloyd S. Benjamin, David Dunlap, and Hull, Leiby and Metzger, for steam heating company, intervening appellee.
OPINION BY RHODES, P.J., September 13, 1962:
These appeals are taken from an order of the Pennsylvania Public Utility Commission issued on November 20, 1961, sustaining increases in rates of Allegheny County Steam Heating Company.
*621 Several questions are raised on these appeals, one of which involves the matter of negative salvage.
The proposed rates filed by Allegheny County Steam Heating Company provided in general for a 15 per cent increase estimated at $402,600 under a tariff supplement filed on August 31, 1960, to become effective on November 1, 1960. The Allegheny County Steam Heating Company, intervening appellee, hereinafter referred to as "Allegheny," is a wholly owned subsidiary of Duquesne Light Company, and provides steam heating service from its own plants to hotels, office buildings, institutional buildings, and mercantile establishments served in the downtown section of the City of Pittsburgh.
Prior to the effective date, formal complaints were filed by various customers of Allegheny, by the Building Owners and Managers Association of Pittsburgh (also referred to as BOMA), some of whose members are customers of Allegheny, and by the City of Pittsburgh. Subsequently a complaint was filed by the County of Allegheny. The complaints were consolidated by the commission for the purpose of hearings. The commission suspended the proposed rates to May 1, 1961, and again to August 1, 1961, and instituted an investigation on its own motion. Allegheny voluntarily postponed the effective date of its new tariff to October 17, 1961, which was beyond the maximum suspension period allowed by the Public Utility Law. On October 16, 1961, the commission issued a temporary order continuing the existing rates in effect until a final order should issue. The final order sustaining the proposed rates was issued on November 20, 1961, and it is from this order that the instant appeals were taken. The appeals to this Court were taken by all the above complainants except the County of Allegheny.
Appellants seek to have the commission's order reversed or the record remanded to the commission for *622 a consideration of the issues here presented. The relevant factual background has been stated by the commission in its order of November 20, 1961, as follows:
"The chartered service area of respondent includes not only the City of Pittsburgh but the whole of Allegheny County and adjacent territories as well. However, the actual service area has been limited to Pittsburgh's Golden Triangle and is bounded by the Allegheny and Monongahela Rivers and with the easterly boundary, beginning at the Allegheny River, lying along 16th Street, Bigelow Boulevard, Washington Place and Hooper Street to the Monongahela River.
"Physical plant includes the Stanwix Steam Heating Plant located at Fort Duquesne Boulevard and Cecil Alley, and the Twelfth Street Steam Heating Plant located at Twelfth and Etna Streets, both in downtown Pittsburgh. The principal steam mains are located under the streets in tunnels which join the two heating plants. These tunnels are sufficiently large to permit workmen to pass through to make inspections and repairs. Other steam mains which radiate out from the principal steam mains in the tunnels, together with condensate return lines, are buried directly in the earth in an envelope of reinforced concrete or are supported on brackets in vaults underneath sidewalks. . . .
"Respondent's underground system at December 31, 1960 consists of over 1.6 miles of tunnels, through which mains of various sizes traverse (predominately 6-inch and 8-inch), the largest being 32 inches in diameter. The transmission and distribution mains consist of over 13 miles of insulated high-pressure steel and low-pressure steel steam mains, approximately 10 miles of condensate return line and 414 condensate type meters."
FAIR VALUE. The commission fixed a fair value of Allegheny's plant at $10,000,000. Allegheny submitted depreciated measures of value as follows: Original cost, *623 $7,521,828 in service at July 31, 1960; trended original cost at 3-year average prices, $18,348,758; trended original cost at 5-year average prices, $17,540,044. In its brief Allegheny contends that the minimum fair value should have been found to be in the neighborhood of $12,500,000, but recognized that, since the proposed increase of rates was sustained, Allegheny could not appeal. Philadelphia Transportation Company v. Pennsylvania Public Utility Commission, 350 Pa. 373, 39 A. 2d 372.
DEPRECIATION  NEGATIVE SALVAGE: An issue in this proceeding is whether negative salvage should be considered in determining accrued and annual depreciation.
In arriving at its determination of accrued depreciation, the commission refused to include any amount of prospective negative salvage to increase the accrued depreciation, but in determining annual depreciation allowed an additional amount to permit the recovery in annual installments of the ultimate prospective negative salvage. Negative salvage is the loss a utility suffers upon the retirement of property resulting from the necessity to expend funds in excess of the salvage value in order to remove the property. In this instance the negative salvage under consideration is the additional cost of removing steam distribution mains. We note also that we are dealing with prospective negative salvage, that is, the estimated negative salvage to be incurred if and when the distribution mains are removed some time in the future.
Allegheny submitted a study showing that for the 5½-year period ending July 31, 1960, it had retired distribution mains costing $91,236 originally, and that the net cost of removing these mains from the tunnels and streets was $54,585, or about 60 per cent of their original cost. Allegheny estimated that for every segment of its distribution system which is retired it would incur *624 a net removal cost equal to 50 per cent of the original cost. The record shows that steam mains entered into the rate base at an original cost in excess of $4,000,000, and that the ultimate removal cost of 50 per cent would be more than $2,000,000.
Appellants take issue with the commission's refusal to consider negative salvage as additional accrued depreciation in determining the service value of the physical plant, and with the allowance by the commission of an annual amount for negative salvage in the allowance for annual depreciation.
When the commission rejected appellants' contention that negative salvage should be added to accrued depreciation in order to reduce the service value of the plant, the commission stated: "The second error in principle in BOMA Exhibit No. G is a more serious one. That error is to include any amount per se as negative salvage. An accumulation against a future cost does not reduce the service value of an existing asset." In this holding the commission was correct. The negative salvage here involved in both the accrued and annual depreciation issues is prospective, as we have indicated, in that it is a cost which has not yet been incurred but is one which is estimated to occur at some time in the future. Accrued depreciation for rate purposes means "the actual depreciation of the utility's property as it has accrued to the date that fair value is in issue." Pittsburgh v. Pennsylvania Public Utility Commission, 187 Pa. Superior Ct. 341, 353, 144 A. 2d 648, 655. We have also said that accrued depreciation properly determined "should disclose the consumption of property to date." Pittsburgh v. Pennsylvania Public Utility Commission, 178 Pa. Superior Ct. 46, 54, 112 A. 2d 826, 829. Since negative salvage relating to assets which are still in service is purely prospective and does not represent a part of the original cost, recognition of it in accrued depreciation cannot *625 reflect an actual accrual of depreciation or the consumption of the property to the date that fair value is determined. A capital expenditure not yet made cannot be consumed in advance; and, since reproduction cost (or trended original cost) is based upon the identical existing plant rather than a substitute plant, the accrued depreciation applicable thereto should not reflect negative salvage. The cost of removing the existing facilities forms no part of the reproduction cost. Moreover, if prospective negative salvage had been added to accrued depreciation, much of Allegheny's plant would have had a minus or negative value, plainly inconsistent with actualities. See Orlosky v. Pennsylvania Public Utility Commission, 171 Pa. Superior Ct. 409, 417, 89 A. 2d 903.
If negative salvage were to be considered in the accrual of depreciation, there would necessarily have to be an addition to original cost representing the negative salvage against which the depreciation accrual could be made. In this respect, the 1943 Report of the Committee on Depreciation, National Association of Railroad and Utility Commissioners, states (p. 42): "The cost of removing many materials which constitute the operating units of property often results in a very small net salvage. In many individual cases and possibly in the cases of some entire classes of property the salvage may be negative. Wherever this can be demonstrated the depreciable plant should be considered to be in excess of the cost in order to maintain the integrity of the reserve and to charge to operating expenses the full cost of services received from plant."
However, the uncertainty associated with such prospective negative salvage, and the fact that it has not been incurred at the time fair value is in issue as original cost (or even as proposed reproduction cost) prevents its consideration in the determination of the measures of value and the actual accrued depreciation *626 attributable thereto. In determining fair value it is clear that one of the measures of value, against which depreciation is accrued, is the original cost of construction, that is, the cost when first devoted to public service, which of course does not include future costs of removal. Scranton-Spring Brook Water Service Company v. Pennsylvania Public Utility Commission, 165 Pa. Superior Ct. 286, 294, 295, 67 A. 2d 735; Harrisburg Steel Corporation v. Pennsylvania Public Utility Commission, 176 Pa. Superior Ct. 550, 556, 109 A. 2d 719.
Although the commission properly refused to recognize negative salvage in the matter of accrued depreciation, it did consider negative salvage in the matter of annual depreciation. This was erroneous and was an inconsistent treatment. Pittsburgh v. Pennsylvania Public Utility Commission, 182 Pa. Superior Ct. 551, 558, 128 A. 2d 372. In making its allowance for negative salvage under annual depreciation the commission stated: "Respondent claims $205,097 for annual depreciation based on depreciable original cost at July 31, 1960, properly excluding contributions in aid of construction. Included in the annual provision of $205,097 is the amount of $33,294 representing annual amortization of the ultimate net cost of removal of plant upon retirement. Although we do not agree with complainant that the accrued provision for this item should be deducted from measures of value, we are of the opinion that respondent should be allowed, as an annual cost, only that lesser amount which, capitalized at 4 per cent per annum compounded, will produce, together with the accrued portion at July 31, 1960, the total amount of ultimate net negative salvage requirement. Under this approach, the amount of principal required annually would be $14,362, thus reducing respondent's total claim for annual depreciation from $205,097 to $186,165."
*627 Annual depreciation is an operating expense representing the consumption of assets in rendering service. A utility is entitled under the law to recover from the rate payers the original cost of construction of its depreciable plant. Harrisburg Steel Corporation v. Pennsylvania Public Utility Commission, supra, 176 Pa. Superior Ct. 550, 560, 109 A. 2d 719; Scranton Steam Heat Company v. Pennsylvania Public Utility Commission, 194 Pa. Superior Ct. 143, 156, 167 A. 2d 693; 405 Pa. 397, 403, 404, 176 A. 2d 86. It is clear in our law that "In no event will a utility be permitted to recover by annual allowances for depreciation a total amount in excess of the original cost, since annual depreciation is computed on original cost and not upon fair value or reproduction cost." Pittsburgh v. Pennsylvania Public Utility Commission, supra, 187 Pa. Superior Ct. 341, 356, 144 A. 2d 648, 657. Negative salvage attributed to existing plant is purely prospective; it is a cost which has not yet been incurred; it is uncertain when and if it will be incurred; and it is not a part of the original cost of construction of the facilities when first devoted to public service. To permit the recovery of prospective negative salvage is to permit the recovery of a total amount in excess of the original cost of construction prior to the actual expenditure of those costs and, in our opinion, represents the recovery of something in the nature of a future reproduction cost. The established law in this Commonwealth does not permit the recovery by annual depreciation of any such prospective excess. It is therefore the prospective nature of future negative salvage that prevents it from being considered either in accrued depreciation or in the allowance for annual depreciation; they must have a consistent basis under our law.
Although prospective negative salvage is not entitled to consideration, the negative salvage actually incurred by the utility either upon the actual retirement *628 of a property without replacement or upon the replacement of an item of property is of course entitled to consideration in a rate proceeding. It is then no longer prospective but actual. If the utility retires and removes a property without replacing it or replaces it after removal and incurs actual negative salvage in doing so, the expenditure should be capitalized and amortized by some reasonable method and for and over a reasonable length of time. Such a situation is similar to that existing when a reserve requirement for depreciation is found to be deficient. We have approved the recovery of such deficiency as part of the annual depreciation charges in order that the utility might be reimbursed for the full original cost of its property. Harrisburg Steel Corporation v. Pennsylvania Public Utility Commission, supra, 176 Pa. Superior Ct. 550, 559, 560, 109 A. 2d 719; Duquesne Light Company v. Pennsylvania Public Utility Commission, 176 Pa. Superior Ct. 568, 590-593, 107 A. 2d 745. What we said in the Harrisburg Steel Corporation case is appropriate (page 559 of 176 Pa. Superior Ct., page 724 of 109 A. 2d): "The very elements which enter into estimates of depreciation are not constant. Measuring the rate of consumption of capital over service life by wear and tear alone, is not a complete answer. Functional causes such as inadequacy or obsolescence are involved. Inadequacy may retire property prematurely because of the load requirement of increased demands. And obsolescence, for example, may be accelerated by unforeseeable developments for efficiency in the art of mechanics of production. Padding of estimates of annual depreciation on the books of a utility to meet such contingencies or to compensate for possible errors in judgment, by annual depreciation allowances over the service life of the property is not to be encouraged. A public utility is entitled under the law to recover from the rate payers the original cost of its depreciable plant. Depreciation is an operating expense and represents *629 the consumption of assets in rendering service. Errors of judgment in estimating depreciation in any one year or over a period of years however do not in themselves bar the utility from recovering any actual deficiency from the rate payers in later years." If past deficiencies in annual depreciation may be recovered in later years, negative salvage may properly be recovered after it is actually incurred.[1]
The elimination of negative salvage from annual depreciation results in the $14,362 allowed therefor becoming additional return under the proposed rates, thereby increasing the return of $599,177 found by the commission to $613,593. Based upon the fair value finding of $10,000,000, this is a return of 6.135 per cent. Upon remand the commission should determine *630 whether or not this is a reasonable return or otherwise affects the outcome of the case under the circumstances.[2]
ACCRUED DEPRECIATION  BOOK RESERVE: Appellants contend that the commission erred in accepting Allegheny's reserve requirement study and failed to give adequate consideration to Allegheny's book reserve for depreciation as applied to original cost. Its balance sheet for the test year showed a book reserve of $4,520,400, whereas, accrued depreciation, based on Allegheny's reserve requirement study and accepted by the commission, amounted to $3,300,654 applicable to Allegheny's original cost estimate of $10,779,332, giving a depreciated original cost, less contributions in aid of construction, of $7,521,828. After indicating acceptance of Allegheny's reserve requirement study, the commission stated: "Complainants contend that book depreciation, rather than reserve requirement, should be adopted in this proceeding. This contention will not be ignored by us." The commission made no specific finding as to accrued depreciation, but considered all the measures of value and accrued depreciation factors in arriving at its fair value finding of $10,000,000. We find no error in the commission's treatment of accrued depreciation. It appears that the commission considered all relevant factors relative to accrued depreciation. We said in Pittsburgh v. Pennsylvania Public Utility Commission, supra, 187 Pa. Superior Ct. 341, 356, 144 A. 2d 648, 656: "In this respect the controlling issue is the actual depreciation . . . at the time fair value is to be found, as that may be determined by the *631 exercise of a well founded judgment having basis in the evidence." We also said in Pittsburgh v. Pennsylvania Public Utility Commission, supra, 178 Pa. Superior Ct. 46, 59, 112 A. 2d 826, 831: ". . . the relative weight to be given any particular evidence on depreciation is, under ordinary circumstances, for the commission. Thus the relative weight to be accorded book reserve and a reserve requirement study would be for the commission as the trier of fact." The reserve set-up on Allegheny's books is not binding upon the commission. Pittsburgh v. Pennsylvania Public Utility Commission, supra, 182 Pa. Superior Ct. 551, 558, 128 A. 2d 372; Pittsburgh v. Pennsylvania Public Utility Commission, supra, 187 Pa. Superior Ct. 341, 354, 144 A. 2d 648.
INCOME TAXES: The commission allowed Allegheny the federal income taxes actually paid. These taxes were computed on the basis of Allegheny's actual capital structure consisting of 100 per cent stock all owned by its parent, Duquesne Light Company. Admittedly, a capital structure of 50 per cent debt and 50 per cent stock would have resulted in lower income taxes. Appellants contend that adoption of the capital structure was a clear abuse of managerial discretion, and that the commission should not have allowed the income taxes actually paid in this rate case. Appellants concede that, under principles set forth in Pittsburgh v. Pennsylvania Public Utility Commission, supra, 187 Pa. Superior Ct. 341, 359, 144 A. 2d 648, they would have to show abuse of managerial discretion under the capital structure as actually set up and established by Allegheny. We do not believe the commission committed error in allowing the income taxes actually paid. Riverton Consolidated Water Company v. Pennsylvania Public Utility Commission, 186 Pa. Superior Ct. 1, 20, 140 A. 2d 114; Pittsburgh v. Pennsylvania Public Utility Commission, supra, 187 Pa. Superior Ct. 341, 359, 144 A. 2d 648.
*632 FAIR RETURN  COST OF CAPITAL: The commission found that income available for return of $599,177 would produce a return of 5.99 per cent on a fair value finding of $10,000,000, and that "In view of all of the evidence, such a rate of return is not unreasonable." The commission may refrain from making specific findings on fair value and rate of return if the evidence is sufficient to enable it to reach its conclusion without making such findings. A more specific finding on rate of return was not indispensable. Johnstown v. Pennsylvania Public Utility Commission, 184 Pa. Superior Ct. 56, 64-68, 133 A. 2d 246. In this connection appellants contend (1) that the cost of capital of Allegheny's parent, Duquesne, should have been used to fix rate of return, (2) that the use of gas companies by Allegheny's expert witness Kraemer as comparable in estimating cost of capital was erroneous, and (3) that there is not sufficient evidence in the record to support the conclusion as to rate of return. Allegheny's expert witness Kraemer testified that the composite cost of capital to Allegheny would be 6.75 per cent on a 50-50 capital ratio, based on debt costs of 5.5 per cent and equity costs of 8 per cent. This witness gave expert opinion testimony as to why Duquesne's cost of capital was not comparable to that of Allegheny, and he stated also that the three gas companies reviewed presented a cost of capital most nearly comparable to Allegheny's. For instance, this witness testified that Allegheny's sales, like those of gas companies, are highly seasonal; that sales volume and revenues fluctuate widely depending upon winter temperatures.[3] He also stated *633 that Allegheny which produced its own steam, unlike subsidiaries of electric companies using exhaust steam, was an independent operation not comparable to an electric company as to cost of capital. The commission could consider the capital structure of comparable utilities and the actual capital structure of this utility, but it was not obliged to accept the cost of capital to the parent company as controlling. Riverton Consolidated Water Company v. Pennsylvania Public Utility Commission, supra, 186 Pa. Superior Ct. 1, 15, 17, 140 A. 2d 114. There was substantial evidence in the record to support the rate of return used, and we find no error in the order of the commission in this respect.
ALLOCATION OF COSTS: Allegheny has no supervisory staff of its own other than direct operating personnel. Employes of Duquesne handle such services to Allegheny as engineering, legal, sales, accounting, meter reading, billing, collecting, and over-all supervision on a part-time basis for which services Duquesne allocates charges to Allegheny. The companies have a single management. For the test year (12 months ended July 31, 1960), Allegheny was charged by Duquesne and claimed as costs the sum of $190,000. Of this amount $34,683 covered commercial expenses, and $42,756 new business expenses. Appellants question the reasonableness of these cost allocations between the parent, Duquesne, and its subsidiary, Allegheny, citing Berner v. Pennsylvania Public Utility Commission, 382 Pa. 622, 116 A. 2d 738. Allegheny introduced extensive and voluminous evidence to substantiate these cost allocations, and they were subjected to careful scrutiny. The commission considered fully appellants' contentions regarding allocation of these costs, and, with one exception, *634 found no evidence in support thereof. However, the commission allowed only $15,000 of Allegheny's claim of $30,819 for sales and new business salaries. The commission's allocation of these contested cost items for the test year is supported by evidence. Admittedly, allocation of costs and expenses involves judgment on numerous facts. Colorado Interstate Gas Company v. Federal Power Commission, 324 U.S. 581, 589, 591, 65 S. Ct. 829, 89 L. Ed. 1206. The acceptance or rejection of allocation studies involves weight and credibility of the evidence, and the commission's order will not be set aside except for error of law or lack of evidence to support its finding, determination, or order. Duquesne Light Company v. Pennsylvania Public Utility Commission, 174 Pa. Superior Ct. 62, 70, 99 A. 2d 61. The allocations do not appear to be unfair or lacking support in the evidence, and we find no error in this respect.
RATIO OF EXPENSES TO REVENUES: In adjusting or annualizing the test year figures to reflect an estimated increase of $10,932 in revenues after the test year, the commission accepted Allegheny's ratio of 57 per cent, or $6,231, attributable to increased operating expenses. Appellants' witness contended for an operating ratio of only 43 per cent. The record shows an actual operating ratio of expenses to increased revenues of approximately 65 per cent for the preceding five years. Appellants' contention that the commission action in this respect was erroneous is without merit. The 57 per cent figure was within the area of the commission's function as the fact-finding body. In any event, use of the 43 per cent figure contended for by appellants would reduce the utility's operating expenses, applicable to the $10,932 increased revenue, by only $1,531, and this would be de minimis with relation to total operating expenses (excluding depreciation and taxes) of $1,815,502 under the proposed rates.
*635 COAL COSTS: Finally, appellants complain that the commission allowed Allegheny costs for purchase of coal at prices about 20 per cent in excess of Duquesne's coal costs. Admittedly, Allegheny's coal costs were higher than those of Duquesne. However, there were distinguishing factors which furnished a basis for the commission's allowance of higher coal costs for Allegheny. The steam heat utility did not purchase its coal from its parent, Duquesne, but from outside sources under sealed bids. Allegheny lacked facilities for volume storage of coal necessitating that its suppliers stockpile coal at increased expense. Further, it appeared that Duquesne's coal differs in quantity and quality from that used by Allegheny. Appellants' argument that various factors involved should have resulted in coal costs to Allegheny that were lower and more nearly in line with those of Duquesne relates principally to questions of credibility and weight to be given the evidence produced. Under settled principles, these were matters of fact for determination by the commission. Harrisburg Steel Corporation v. Pennsylvania Public Utility Commission, supra, 176 Pa. Superior Ct. 550, 109 A. 2d 719.
The order of the commission is set aside to the extent indicated; and the record is remanded for further consideration of the disallowance of negative salvage relating to annual depreciation and its effect upon the rate of return. Upon such further consideration, the commission shall enter an appropriate order. In other respects, the order of the commission is affirmed.
NOTES
[1] We note in the Uniform Classification of Accounts for Steam Heating Companies the following:

"131. Property Abandoned
"Charge to this account the money cost, estimated if not known, less the salvage and the accumulated amount reserved for the depreciation thereof, of any important piece of property other than land, which the utility itself abandons for the purpose of replacing it with more efficient property, or which, on account of public necessity or the requirement of lawful authority, it is compelled to abandon before such property has attained its normal life of service.
"Charge also to this account extraordinary losses which result in the abandonment of property, . . .
"The loss on abandoned property registered in this account shall be amortized over a period of years by charges either to `430. Extraordinary Renewals and Replacements' or `809. Amortization Unprovided For Elsewhere' . . .
"B A 430. Extraordinary Renewals And Replacements
"Charge to this account and credit to `131. Property Abandoned' account that amount which will, through regular application, amortize those losses suffered by the utility either from the abandonment of its property or from extraordinary casualties.
"The utility shall not amortize any losses through this account until it obtains the permission of The Public Service Commission."
[2] The commission made no specific finding of rate of return. Instead it merely found that a return of 5.99 per cent was not unreasonable. Whether a return of 6.135 per cent is unreasonable should be determined by the commission. We note that claimed composite cost of capital, a very significant factor in determining rate of return, was 6.75 per cent. See Riverton Consolidated Water Company v. Pennsylvania Public Utility Commission, 186 Pa. Superior Ct. 1, 14, 15, 32, 140 A. 2d 114.
[3] The commission has observed that steam heating service ". . . is in direct competition with the private heating plants using a variety of fuels, . . ." Pennsylvania Public Utility Commission v. Aronimink Park Heating Company, 24 Pa. P.U.C. 713, 723.

The different risks inherent in the various types of utility service are illustrated in Pfeifle v. Pennsylvania Power and Light Company, 25 Pa. P.U.C. 52, 88, wherein the commission permitted the utility a 6 per cent return on electric facilities, a 6.5 per cent return on gas facilities, and a 6.75 per cent return on steam heat facilities.