The Bell Telephone Company of Pennsylvania, Appellant, *v.* Commonwealth of Pennsylvania, Pennsylvania Public Utility Commission, Appellee.

334

Argued December 4, 1974, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT.

*John B. King,* with him *Donald F. Clarke, Gerard J. St.John, George P. Williams, III, Irving R. Segal,* and *Schnader, Harrison, Segal & Lewis,* for appellant.

*Albert W. Johnson, III,* Assistant Counsel, with him *Daniel F. Joella,* Assistant Counsel, and *Edward Munce,* Acting Counsel, for appellee.

*Gerry J. Elman,* Deputy Attorney General, with him *Lawrence Silver,* Deputy Attorney General, and *Israel Packel,* Attorney General, for intervening appellee, Commonwealth of Pennsylvania.

*Lewis M. Taffer* for intervening appellees, Alliance for Consumer Protection and Elizabeth Gunter.

OPINION BY JUDGE ROGERS, February 6, 1975:

This is a public utility rate case.

The appellant, The Bell Telephone Company of Pennsylvania (Bell), in December, 1972 and January, 1973

filed tariffs with The Pennsylvania Public Utility Commission (Commission) which increased Bell's annual revenues $56,417,000 for non-toll services to be effective February 7, 1973, and $3,386,700 for toll services to be effective January 22, 1973, or a total of $59,803,700 at the December 31, 1972 level of operations. The Commission allowed the tariff respecting toll services to become effective as proposed. The tariff revisions for non-toll services were suspended, an investigation instituted and numerous complaints received for filing.

After lengthy hearings, the Commission entered its final order on December 21, 1973. The Commission found that the fair value of Bell's property used and useful in public service at the end of 1972 to be $1,875,000,000 and that a fair rate of return which Bell should be allowed to earn on that fair value was 8%[1] ($150,000,000). It allowed operating revenue deductions of $636,557,000, producing, when added to the return, allowable operating revenues of $786,557,000, compared to Bell's proposed revenues of $806,338,642. The Commission thus disallowed $19,781,642 of the proposed rate increase. Among the items of expense substantially reduced was that for test year Federal income taxes claimed by Bell in the amount of $92,139,718 and computed by the Commission on the basis of operating revenues and operating expenses allowed by its order at $81,439,232. Included in the Commission's computation is a deduction from the amount of Federal income tax Bell will be required to pay of the sum of $3,500,000 described by the Commission simply as a "judgment amount" disallowance. As we understand the Commission's discussion of the item, the $3,500,000 was disallowed either because (a) there are tax advantages, not described by the Commission, to American Telephone and Telegraph Company (AT&T), Bell's parent, and its subsidiaries from the filing of a consoli-

---

1. Bell's submissions suggested a fair value of $2,347,247,000 and a fair rate of return of 9.50 percent.

dated tax return, which is their practice, some of which should be allocated to Bell, or, (or additionally), because (b) AT&T has interest bearing debt which provides it with a tax deduction,[2] some of which should be allocated to Bell.

Bell's appeal from the Commission's order raised only the propriety of this disallowance of $3,500,000 of the amount it is required to pay in Federal income taxes.[3]

AT&T owns all or the majority of the voting stock of 21 operating telephone companies, including the appellant. AT&T is also an operating telephone company furnishing long distance interstate service by interconnecting areas served by other telephone companies, including many which it does not own. AT&T additionally owns all of the stock of Western Electric Company, which manufactures and supplies telephone equipment, and one-half of the stock of Bell Telephone Laboratories, the research facility for AT&T and its subsidiaries. Western Electric owns the remaining one-half of the stock of the Laboratories.

Bell's general accountant testified without refutation either in the record or in the briefs filed by the Commission that Bell receives exactly the same tax deduction for its interest as it would if it filed a separate return, and that any benefits of consolidation contributed by Bell enure to the benefit of its ratepayers, including the principal advantage of filing a consolidated return, the deferral of taxes on Western Electric profits on sales of its products to Bell.[4] Our examination of the Treasury

---

2.  The Commission calls this a rebate.

3.  Other parties have filed cross-appeals not consolidated with this appeal which remain pending before us.

4.  The deferred taxes are paid to the subsidiaries making purchases and credited to their plant accounts in reduction of original cost of plant investment, reducing annual depreciation and increasing Federal income taxes over the life of the plant. The net effect is to give the subsidiaries the immediate use of the money which otherwise would be paid by Western Electric in taxes.

regulations[5] pursuant to which the consolidated return is filed convinces us that there is no advantage of such filing, including any relating to interest, which is not fairly allocated to Bell. Bell's obligations for interest are fully taken into account in the allocation of its obligation for taxes.[6] In short, the record discloses no advantage of a consolidated return not afforded Bell and no disadvantage thereof to Bell, and the Commission's assertions to the contrary are without foundation.

The Commission's alternative reason for reducing Bell's claimed expense for Federal income tax paid was the assumed support of Bell's capital stock by AT&T's debt, with the result, according to the Commission, that "interest [thereon] provides income tax credits to the parent that should be allocated to [Bell]." It is conceded by all parties that it is impossible to ascertain what amount, if any, of the proceeds of AT&T's debt was employed in support of Bell's capital. Part or all of this money could have been used in AT&T's other operations independent of its operating subsidiaries. The Commission obviously proceeded on the basis that it may be inferred that since AT&T has debt and since it owns Bell's stock, some of AT&T's debt was employed "in support" of Bell's capital. This is not a novel theory. It has been the subject for more than 20 years of attention by the National Association of Regulatory Commissioners (NARUC), whose Committee on Accounts and Statistics has developed procedures for allocating Federal income taxes among AT&T and its affiliates, including, apparent-

---

A further potential advantage would obtain if one or more of the filing corporations suffered operating losses. None of the companies included in the consolidated return of AT&T and its affiliates suffered a loss.

5. Regulations 1-5502-11 et seq., 1973 CCH Standard Tax Reports §4902.

6. Which Bell pays directly to the Internal Revenue Service. Internal Revenue Code of 1954, §6302(c), 26 U.S.C.A. §6302(c).

ly, some affiliates in which AT&T has a minority interest and which under the Internal Revenue Code may not be joined in a consolidated return. We are not called upon to pass judgment on the NARUC committee proposal since the Pennsylvania Public Utility Commission's brief tells us that "recognizing the shortcomings of using the Bell System average debt component, it did not base its findings on the NARUC method."[7] As the Commission's brief further discloses, it "looked only to Pa. Bell's debt interest and interest on AT&T's debt which is converted to equity in Pa. Bell, exclusive of retained earnings, to arrive at the true cost as represented in taxes, of the investment on which ratepayers must provide a return." One looking to the "debt interest" of the corporations referred to by the Commission, as they appear in the record, would see that Bell's long-term debt at the end of the test year 1972 was 34.5% of total capital, excluding short-term debt, and that this ratio increased to 39.1% as of June 30, 1973. It would be observed further that AT&T's debt ratio was about 27%. The facts are therefore far different from the hypothetical posed by the Commission's brief, quoting from a treatise on public utility regulation, of "a public utility holding company [which could] obtain for its own security holders tax benefits which arise from having the top company issue comparatively substantial indebtedness while the capital structures of subsidiaries are represented largely by common stocks." Indeed, elsewhere in its brief, the Commission states: "The decision of management to issue debt at the parent A.T.&T. level is not questioned by

---

7. However, in Bell's 1971 rate case, the Commission reduced the allowance for Federal income tax purposes by $1,870,000, relying on the then current NARUC committee report. *Pa. P.U.C. v. Bell Telephone Company of Pennsylvania*, 45 Pa. P.U.C. 675 (1971). It thus overruled its earlier rejection of the NARUC method in *Pa. P.U.C. v. Bell Telephone Company of Pennsylvania*, 39 Pa. P.U.C. 649 (1962).

the Commission. Timing, the size of the offering, bond ratings, and the attitude of the investing public may dictate that debt issuance at the parent level will result in a lower cost and is therefore more prudent than issuing debt at the subsidiary level. Furthermore, debt at the parent level provides flexibility not obtainable at the subsidiary level. Debt financing at the parent level enables A.T.&T. to increase its investment in its subsidiaries as their need for capital arises. However, so long as debt at the parent level is a surrogate for or supplement to financing at the subsidiary level it is only fair and equitable to reflect the associated tax savings in the rates paid by the customers of the operating subsidiary." The difficulty with the Commission's order is that there is nothing in this record suggesting that AT&T's debt is either a "surrogate for or supplement to" Bell's financing and no evidence of unfairness to Bell's ratepayers resulting from AT&T's debt, which the Commission concedes has advantages for all members of the system. The Commission's disallowance of Bell's debt thus rests on a hypothesis, as its description "judgment amount," suggests.

The Superior Court consistently refused to allow hypothetical tax expenses. *Pittsburgh v. Pa. P.U.C.*, 208 Pa. Superior Ct. 260, 222 A.2d 395 (1966) ; *Penn Sheraton Hotel v Pa. P.U.C.*, 198 Pa. Superior Ct. 618, 184 A.2d 324 (1962) ; *Riverton Consolidated Water Company v. Pa. P.U.C.*, 186 Pa. Superior Ct. 1, 140 A.2d 114 (1958) ; *Pittsburgh v. Pa. P.U.C.*, 187 Pa. Superior Ct. 341, 144 A.2d 648 (1958) ; *Pittsburgh v. Pa. P.U.C.*, 182 Pa. Superior Ct. 551, 128 A.2d 372 (1956). We see no more reason why hypothetical disallowances should be warranted.

This is not to say that if managerial discretion is exercised with the purpose and effect of arranging the capital structures of a parent and controlled subsidiaries of requiring the latters' subscribers to pay higher rates

to meet taxes and of affording the parent greater tax deductions, the Commission may not disallow some of the expense claimed by subsidiaries for taxes paid. Such action on the part of management would be an abuse of discretion, of which the Commission admits there is here no evidence in this record. *See Penn Sheraton Hotel v. Pa. P.U.C.*, 198 Pa. Superior Ct. 618, 184 A.2d 324 (1962). Nor do we hold that the Commission may not disallow portions of a subsidiary's tax expense upon a showing that the advantages of filing a consolidated return have been denied the affiliate and conferred upon the parent or other affiliates. Here, however, Bell has convincingly demonstrated without rebuttal, not only that it has paid the same amount as would be due under a separate return and that it has additionally received every advantage of the consolidated filing.

The Commission's action in disallowing $3,500,000 of Federal income taxes paid by the respondent, The Bell Telephone Company of Pennsylvania, is reversed with direction to the Commission to add $3,500,000 to the presently allowed revenue deduction for income taxes and to adjust the amount of allowable operating revenues accordingly; the record will rest with this Court pending disposition of the appeals from the Commission's order of other parties on other issues.