William J. Green and The City of Philadelphia, Petitioners *v.* Pennsylvania Public Utility Commission, Respondent. Philadelphia Electric Company et al., Intervenors.

William J. Green and The City of Philadelphia, Petitioners *v.* Pennsylvania Public Utility Commission, Respondent.

Walter W. Cohen, Consumer Advocate, Petitioner *v.* Pennsylvania Public Utility Commission, Respondent.

Argued May 10, 1983, before President Judge CRUMLISH, JR., and Judges WILLIAMS, JR., CRAIG, MAC-PHAIL and DOYLE.

*Andre C. Dasent,* Deputy City Solicitor, with him *Joseph C. Crawford,* Deputy City Solicitor, *Alan J. Davis,* City Solicitor, *Mark A. Aronchick,* City Solicitor, *Herbert Smolen,* Deputy City Solicitor, and *Michael S. Chuhinka,* Assistant City Solicitor, and of counsel; *Nicholas J. Scobbo,* for petitioners, William J. Green and the City of Philadelphia.

*Irwin A. Popowsky,* Assistant Consumer Advocate, with him *David Wersan and Craig R. Burgraff,* Assistant Consumer Advocates, *David M. Barasch,* Act-

ing Consumer Adovcate, and *Walter W. Cohen,* Consumer Advocate, for petitioner, Walter W. Cohen, Consumer Advocate.

*Marlane R. Chestnut,* Assistant Counsel, with her, *Barry Applebaum and Gregg C. Sayre,* Assistant Counsels, *Albert W. Johnson, III and Steven A. McClaren,* Deputy Chief Counsels, and *Charles F. Hoffman,* Chief Counsel, for respondent.

*Robert H. Young,* with him *Walter R. Hall, II, David B. MacGregor, Margaret B. Dardess and Michael Nearing;* of counsel, *Edward G. Bauer, Jr., and Irene A. McKenna, Morgan, Lewis & Bockius,* for intervenor, Philadelphia Electric Company.

OPINION BY PRESIDENT JUDGE CRUMLISH, JR., March 12, 1984:

We have consolidated for argument and disposition appeals of William J. Green and the City of Philadelphia (City) and Walter W. Cohen, the Consumer Advocate of Pennsylvania (Consumer Advocate) from two orders of the Public Utility Commission (Commission) entered April 24, 1981 and May 21, 1982. The two orders allowed the Philadelphia Electric Company (PECO) annual rate increases of $185,899,000 and $221,708,000, respectively. We affirm.[1]

## No. 2683 C.D. 1981

The City appeals the Commission's order allowing the inclusion in rate base of $185,899,000 for various

---

[1] Our scope of review is limited to a determination of whether constitutional rights have been violated, an error of law committed, or the findings or order of the Commission are not supported by substantial evidence. *Park Towne v. Pennsylvania Public Utility Commission,* 61 Pa. Commonwealth Ct. 285, 289, 433 A.2d 610, 613 (1981).

types of construction work in progress (CWIP). PECO intervenes in support of the order and the Consumer Advocate intervenes in opposition to the order. We affirm.

On July 29, 1980, PECO filed Supplement No. 19 to Tariff Electric-Pa. P.U.C. No. 25 to become effective September 27, 1980. PECO requested an adjusted base rate increase for approximately $303,729,000 in annual revenue based upon a future test year ended March 31, 1981. By order dated August 28, 1980, the Commission initiated an investigation and suspended Supplement No. 19 for seven months. The ALJ issued a Recommended Decision, proposing the approval of the inclusion in rate base of the various types of CWIP. On April 24, 1981, the Commission allowed the inclusion in rate base of $185,899,000 for three types of CWIP: (1) $164,321,000 for future pollution control modifications at PECO's Eddystone and Cromby stations to be made nine months beyond the test year (December 31, 1981); (2) $1,185,000 of safety-related future modifications to the Peach Bottom nuclear plant to be made nine months beyond the test year;[2] and (3) $20,393,000 of "traditional" non-revenue producing CWIP to be completed before the end of 1981.[3]

The Public Utility Code (Code)[4] "authorizes utilities to seek a just and reasonable return on the fair

---

[2] In the order, the Commission refers to $165,506,000 of funds "spent through year-end 1980." The year 1980 is incorrect and the appropriate date is year-end 1981.

[3] The record identifies the "traditional" non-revenue producing CWIP projects as numerous miscellaneous minor projects at the Keystone, Muddy Run, Eddystone, Peach Bottom, Conomaugh, Salem Unit I and Schuylkill plants.

[4] 66 Pa. C. S. §§101—3312.

value of property used and useful in the public service." *The Bell Telephone Co. of Pennsylvania v. Pennsylvania Public Utility Commission,* 47 Pa. Commonwealth Ct. 614, 629, 408 A.2d 917, 925 (1979). Whether any particular property is used and useful in rendering such service is a policy decision left to the discretion of the Commission. *Id.* at 629, 408 A.2d at 925. The Commission has the authority to make adjustments to rate base, *UGI Corp. v. Pennsylvania Public Utility Commission,* 49 Pa. Commonwealth Ct. 69, 79, 410 A.2d 923, 929 (1980), and valuation of property. *See* 66 Pa. C. S. §1311.

The City argues that the Commission's decision to include non-revenue producing CWIP in rate base amounts to an arbitrary abuse of discretion. Consumer Advocate intervenes by contending the Commission's decision was based upon factual error and non-specific and inconsistent reasoning.

Section 1311 of the Code, 66 Pa. C. S. §1311, states:

The commission may, after reasonable notice and hearing, ascertain and fix the fair value of the whole or any part of the property of any public utility, insofar as the same is material to the exercise of the jurisdiction of the commission, and may make revaluations from time to time and ascertain the fair value of all new construction, extensions, and additions to the property of any public utility. When any public utility furnishes more than one of the different types of utility service, the commission shall segregate the property used and useful in furnishing each type of such service, and shall not consider the property of such public utility as a unit in determining the value of the property of such public for the purpose of fixing rates.

In fixing any rate of a public utility engaged exclusively as a common carrier by motor vehicle, the commission may in lieu of other standards established by law, fix the fair return by relating the fair and reasonable operating expenses, depreciation, taxes and other costs of furnishing service to operating revenues.

The Commission has included CWIP in rate base in limited circumstances.[5] "[S]ubstantial expenditures for projects to be completed after the end of the test year will be allowed only if they do not affect the level of operations at year end, i.e., they are non-revenue producing and non-expense reducing,[6] and improve the environment and/or reliability and safety of service." *The Bell Telephone Co.*, 47 Pa. Commonwealth Ct. at 630, 408 A.2d at 926. Construction which will be completed within a short time following the end of the test year is generally includable in rate base because allowance for funds used during construction (AFUDC) may no longer be accumulated after the plant is completed and no substantial cost is shifted to ratepayers. "[T]o the extent that revenues and expenses for the test year do not accurately indicate future revenue and cost trends, the Commission has the duty to make adjustments." *Id.* at 624, 408 A.2d at 923. To provide PECO with a fair opportunity to

---

[5] *Pennsylvania Public Utility Commission v. Philadelphia Water Co.*, 50 Pa. P.U.C. 407 (1976) ; *Pennsylvania Public Utility Commission v. Peoples Natural Gas Co.*, 48 Pa. P.U.C. 210 (1974) ; *Pennsylvania Public Utility Commission v. Duquesne Light Co.*, 48 Pa. P.U.C. 14 (1974).

[6] The rationale behind classifying projects as non-revenue producing and non-expense reducing is to prevent a utility from both earning a current return on a project under construction and recovering current expenses which will be eliminated when the project goes into service.

recover its full operating costs, including a just and reasonable profit, the Commission has discretion to adjust for conditions beyond the test year. *See West Penn Power Co. v. Pennsylvania Public Utility Commission,* 50 Pa. Commonwealth Ct. 164, 412 A.2d 903 (1980); *Pike County Light and Power Co. v. Pennsylvania Public Utility Commission,* 77 Pa. Commonwealth Ct. 268, 465 A.2d 735, 739 (1983). The rate-making process is prospective. *See City of Pittsburgh v. Pennsylvania Public Utility Commission,* 42 Pa. Commonwealth Ct. 242, 245, 400 A.2d 672, 674 (1979).

The Superior Court held that it was appropriate for the Commission to include in the rate base a portion of investment in a new generating plant, even though the plant was not in operation until after the close of the test year. *Duquesne Light Co. v. Pennsylvania Public Utility Commission,* 176 Pa. Superior Ct. 568, 583-84, 107 A.2d 745, 752 (1954). This Court held that the Commission had discretion to include in the rate base a portion of investment in a coal-fired generating unit which was closed after the test year. *West Penn Power.*

The City and the Consumer Advocate argue that any investment beyond six months after the test year should be disallowed. This Court has decided that it is within the Commission's discretion to allow in rate base some expenses six months after the end of the test year but to reject expenses twelve months beyond the end of the test year. *Dauphin Consolidated Water Supply Co. v. Pennsylvania Public Utility Commission,* 55 Pa. Commonwealth Ct. 624, 638, 423 A.2d 1357, 1364 (1980). By providing a nine-month extension after the test year for the rate base adjustment in the instant case, the adjustment falls between these extremes. We therefore conclude that the Commission reasonably exercised its discretionary authority.

The City's next argument is that the Commission's decision is unsupported by the evidence. The burden is on the utility to establish that the property sought to be included in rate base is used and useful in the public service. *The Bell Telephone Co.*, 47 Pa. Commonwealth Ct. at 629, 408 A.2d at 925. We hold that PECO has carried its burden. With respect to the $164,321,000 of pollution control equipment, PECO's evidence shows the Eddystone and Cromby stations were actually in use and the equipment was necessary for the continued operation of the stations according to a federal consent decree.[7] The Commission found that the continued operations of the plants allows PECO to produce coal generation at a lower cost to the present ratepayers[8] because, if these plants were closed, PECO would have to substitute the capacity lost with more expensive power through use of its reserves or through spot market purchases. The record further reveals that the Commission was correct in finding that the equipment, which includes $SO_2$ scrubbers and associated devices for the coal generating stations met the criteria for inclusion of pollution control equipment in rate base. The Commission properly relied on *Pennsylvania Public Utility Commission v. West Penn Power Co.*, 53 P.U.C. 410 (1979), which stated such unusual expenditures will never be revenue-producing, will never increase generation, and could not have been reasonably foreseen at the time of initial construction. Also, the projects improve the environment.

---

[7] The consent decree was negotiated by PECO and the Environmental Protection Agency as a settlement of allegations by the Agency for violations of various federal air quality statutes resulting from PECO's coal generating units at the Eddystone and Cromby stations.

[8] The testimony reveals that the continued operation of these plants saves ratepayers $100,000,000 per year in fuel costs.

In regard to the second type of CWIP to be included in the rate base, the Commission found that the Peach Bottom nuclear station was actually in use[9] and the $1,185,000 of safety-related CWIP was necessary as a result of the Three Mile Island accident. The record indicates that such modifications are required for the continued safe operation of the Peach Bottom plant.[10] Also, it will be less expensive to operate the station than to cease operations and purchase power independently on the market.

Finally, the third type of CWIP to be included in the rate base is the "traditional" non-revenue producing CWIP which was to be in use within nine months of the test year. The evidence shows that the projects were reasonably identifiable as non-revenue producing and non-expense reducing and had no effect on the level of operations at the end of the test year. The Commission found[11] the investment would be used

[9] The evidence reveals the Peach Bottom Plant is PECO's principal nuclear generating facility.

[10] The modifications include core cooling instrumentation, containment isolation, $H_2$ penetrations, shielding, sampling, effluent radiation monitors, $I_2$ instrumentation, containment instrumentation, offsite environmental monitoring, primary containment radiation monitors, and spent fuel pool makeup.

[11] In determining whether to include CWIP in rate base, the Commission properly relied on its previous policy to consider if such projects (1) were completed, or to be completed within a short time past the end of the test year, (2) were reasonably identifiable as non-revenue producing, (3) were reasonably identifiable as non-expense reducing, (4) did not affect the level of operations at the end of the test year, (5) improved environmental conditions, (6) improved the quality and reliability of service, (7) improved safety, (8) disclosed that the amount claimed was actually expensed by a utility, and (9) were significant, relevant and substantial, *Pennsylvania Public Utility Commission v. Bell Telephone Co.*, R-78120719 (1980) (Petition for Reconsideration) ; *Pennsylvania Public Utility Commission v. Duquesne Light Co.*, 48 Pa. P.U.C. 14, 32 (1974).

within a reasonable period of time and each project was necessary for service reliability and quality[12] or required to make existing plants meet environmental requirements.[13]

In the instant case, facts concerning whether on-going construction projects are presently used and useful in the public service change with time. Differing factors include completion dates, construction costs and needs, pollution requirements and safety standards. The utility's return will only be earned if known future investment or operating expense increases are reflected in the rate levels. The record contains substantial evidence of PECO's poor and deteriorating financial condition. The testimony and exhibits indicate the utility is faced with a consistently high rate of inflation in operating expenses and substantial increases in total capital investment due to maintenance of existing plants and the construction of required new plant facilities here at issue. The Commission did not abuse its discretioon by considering PECO's poor and deteriorating financial condition when granting its claim. In arriving at its decision, the Commission did not solely rely on PECO's attrition problem but considered whether the CWIP was associated with improving environmental conditions, safety, reliability and whether the projects were non-revenue producing and non-expense reducing.

Affirmed.

---

[12] PECO's exhibits and testimony indicate these projects included, *inter alia*, installation of chemical cleaning service, valves, tubes, steel stop logs, full capacity air dryer; replacement of piping, feedwater sparger, cooling tower, combustion control system; and the provision of breathing air headers and air supply equipment.

[13] PECO's evidence indicates these projects include, *inter alia*, modification of piping support, fire protection system, waste water treatment plant; installation of particular and $SO_2$ scrubbers; and preparation of ash disposal.

No. 1412 C.D. 1982

No. 1422 C.D. 1982

On July 29, 1981, PECO filed Supplement No. 28 to Tariff Electric-Pa. P.U.C. No. 25 to become effective September 27, 1981. PECO requested an increase in the company's revenues from electric operations by approximately $344,363,000 per year based upon a future test year ending March 31, 1982. By order dated September 16, 1981, the Commission directed a formal rate investigation to be held and suspended Supplement No. 28 for seven months. The ALJ issued a decision recommending that the Commission approve increased annual revenues totaling $209,481,000 and approving each of the requests at issue except the allowance of a current return upon nuclear fuel investment. On May 21, 1982, the Commission allowed PECO an increase of $221,708,000 in total revenues and approved each of the allowances here in issue. The Commission (1) adjusted the Company's allowable wage expense to reflect a predicted wage and benefit increase scheduled to occur approximately four months after the end of the test year; (2) permitted amortization of costs associated with the cancellation of sixteen combustion turbines; (3) included in rate base nuclear fuel in process of refinement, conversion, enrichment and fabrication; (4) included in rate base investment for pollution control and non-expense reducing and non-revenue producing CWIP nine months after the end of the test year; and (5) normalized state income tax benefits associated with accelerated depreciation. The City and Consumer Advocate argue that the Commission abused its discretion in allowing the rate base and expense determination. The City further argues that the Commission's decision was not supported by the substantial evidence.

### 1. Wage Adjustment

With respect to the wage adjustment, PECO projected a wage increase to be 8.2% after presenting evidence that during the past five years it has granted an annual increase averaging 8.2% Based on the testimony presented, the Commission predicted the future conditions to be similar to those of the past.[14] However, the Commission found a 5% wage increase allowance appropriate, which PECO does not challenge on this appeal.[15]

The Commission has the authority to make post test year adjustments for this non-property expense. In *Dauphin Consolidated Water Supply Co.,* this Court affirmed the Commission's allowance of an adjustment for a wage increase six months beyond the end of the test year. In the instant case, the wage increase was projected to go into effect only four months after the end of the future test year. The Commission's consideration of an increase in wage expenses during the period the rates are in effect is to insure that the utility will earn a fair return during that period and therefore the Commission did not abuse its discretion.

### 2. Cancellation of Combustion Turbines

The Commission has authorized PECO to recover four equal annual installments of the $40,106,105 cost of cancelling leases in 1985 for sixteen combustion

---

[14] A PECO witness testified that the 1981 annual inflation rate was 8.8%

[15] The ALJ noted that "it is evident to all that some wage increase will occur." The record illustrates that wages are perhaps the second largest expense item behind purchased fuel that PECO will incur during the period the rates are in effect.

turbine generating units[16] which will become obsolete as of that date primarily because of the known availability of Limerick Unit I.[17] The record demonstrates that PECO's present customers benefit from the current use of the turbines so they should bear the costs associated with the termination. PECO's evidence shows that the cancellation of the leases and approval of present cost amortization will save ratepayers money by avoiding future leases.[18]

The Consumer Advocate contends that the issue of present recovery of future expenses is controlled by *Penn Sheraton Hotel v. Pennsylvania Public Utility Commission*, 198 Pa. Superior Ct. 618, 184 A.2d 324 (1962). The Commission correctly distinguishes the two cases by noting that the instant claim represents liquidated damages associated with the termination of the leases rather than net negative salvage which is not permitted to be in rate base. The amount in question is reasonably certain since the in-service date of Limerick Unit I is no longer unduly speculative. Nega-

---

[16] A PECO witness testified that these units were initially leased in 1971 for twenty-five years. Cancellation of the sixteen units in 1985 will require a $40,016,105 termination payment to the lessor in 1985. The company request $10,027,000 additional revenues per year for four years in order to accrue $5,037,000 annually after taxes or a total of $20,148,000 by the time the units are retired in 1985. PECO's testimony reveals the amount, in addition to the $19,960,000 tax reduction related to the termination payment, will be sufficient to discharge the lease obligation in 1985.

[17] The Commission conducted *Limerick Investigation* I-80100341, and concluded Limerick Unit I is in the public interest, is 70-75% complete, and is scheduled to be on line in 1985.

[18] A PECO witness stated "early termination will save the ratepayers approximately $13 million in terms of 1985 dollars." Also, the ALJ found that, even if Limerick Unit I does not become commercially operable until 1986-1990, benefits still accrue to PECO's ratepayers. The ALJ reasoned that they benefit if the lease is terminated as soon as it goes in service because the annual cost of maintenance and lease rental exceeds the reduction in salvage value.

tive salvage is "the loss a utility suffers upon the retirement of property resulting from the necessity to expend funds in excess of the salvage value in order to remove property."[19]  Since PECO is leasing the turbines, it does not own them, so salvage is not an issue.  The costs in question do not depend on the future value of the turbines nor on the cost to remove them.[20]

The Consumer Advocate further contends that the Commission's amortization allowance violates the test year methodology.  The Commission was correct in explaining that, since this amortization is in the nature of an extraordinary property loss, recovery of the loss is allowed by amortization over a number of years rather than a normal test year expense.  The record indicates this unusual event will not recur annually.

3. NUCLEAR FUEL

PECO seeks rate base treatment for its $39,083,000 investment in nuclear fuel in process of refinement, conversion, enrichment and fabrication.  Specifically, the nuclear fuel which the Commission included in the rate base is intended for use in Salem Unit 1, Peach Bottom Units 2 and 3 (all three of which are presently in operation), Limerick Unit I, and in the Pioneer Uravan Project and the uranium concentrate agreement with the Kerr-McGee Corporation.  PECO argues the money represents investment made by the company in order to have adequate supplies of uranium fuel for all company-owned or jointly-owned nuclear generating stations.

---

[19] *Penn Sheraton Hotel*, 198 Pa. Superior Ct. at 623, 184 A.2d at 327.

[20] *Penn Sheraton Hotel* is limited to whether prospective recovery of net negative salvage should be considered in determining accrued and annual depreciation.

The City and the Consumer Advocate contend that the current ratepayers receive no benefit from this investment and should not be required to absorb the associated carrying costs. Even though the Commission denied a similar claim in No. 2683 C.D. 1981, the Commission is not bound by its prior decision. The facts involved here changed because the previous uncertainty in 1981 regarding Limerick Unit I has ended. The record reveals that a guaranteed fuel supply benefits ratepayers because present acquisition of the fuel provides protection against potential increases plus it insures the future availability of the needed fuel supply.[21] The evidence indicates the investment in future nuclear fuel provides adequate fuel reserves for the company's three nuclear facilities. Although the major portion ($24,505,000) of the claim relates to Limerick Unit I, the investment could be used to fuel the other facilities that are currently in service.

The Consumer Advocate contends that the nuclear fuel in process does not comport with the definition of "used and useful" utility property in Section 1315 of the Code.[22] We hold that Section 1315, effective December 30, 1982, is to be applied prospectively only

---

[21] A PECO witness stated "uranium is an increasingly scarce commodity and that its costs will accelerate at a rapid rate in the future."

[22] Section 1315 of the Code, 66 Pa. C. S. §1315, provides:

Except for such non-revenue producing non-expense reducing investment as may be reasonably shown to be necessary to improve environmental conditions at existing facilities or improve safety at existing facilities or as may be required to convert facilities to the utlization of coal, the cost of construction or expansion of a facility undertaken by a public utility producing, generating, transmitting, distributing or furnishing electricity shall not be made a part of the rate base nor otherwise included in the rates charged by the electric utility until such time as the facility is used

and can have no impact on rates charged prior to its effective date.

Absent clear language to the contrary, statutes are to be construed to operate prospectively only. 1 Pa. C.S.A. §1926; *Department of Labor and Industry, Bureau of Employment Security v. Pennsylvania Engineering Corp*, 54 Pa. Commonwealth Ct. 376, 421 A.2d 521 (1980). The Act contains no such clear language but states "[t]his Act shall take effect immediately" and "shall be applicable to all proceedings pending before the Public Utility Commission and the courts at this time." These provisions are not enough to demonstrate an intent for the Act to be applied retroactively. The Courts have held that the phrase "immediately" means the Act is prospective only. *Commonwealth v. Story*, 497 Pa. 273, 440 A.2d 488, 490 (1981); *Estate of Bertolet*, 483 Pa. 496, 397 A.2d 776 (1979). If the legislature intended the Act to be applied retroactively, it would have so stated.

4. "TRADITIONAL" CWIP

Similar to No. 2683 C.D. 1981, PECO requested rate base treatment of $18,101,000 in "traditional" non-revenue producing, non-expense reducing CWIP for the Eddystone, Croydon, Salem, Delaware, Peach Bottom, Keystone, Conemaugh, Cromby and Schuylkill plants. PECO also claims $285 million of pollution control CWIP for the Eddystone and Cromby

---

and useful in service to the public. Except as stated in this section, no electric utility property shall be deemed used and useful until it is presently providing actual utility service to the customers.

Having decided Section 1315 is inapplicable to the instant case, we need not address the consumer advocate's argument that this section applies to nuclear fuel.

stations.[23]   Both CWIP allowances represent the cost of certain projects to be completed and in service by December 31, 1982, nine months after the end of the test year.   The record reveals that the traditional non-revenue producing, non-expense reducing CWIP projects would be necessary for service reliability and quality[24] or would be required to make existing plants meet environmental requirements.[25]   The evidence further illustrates that the pollution control CWIP for the Eddystone and Cromby stations improve the environment.   For the same reasons stated in No. 2683 C.D. 1981, the similar projects to be completed nine months after the end of the future test year may be included in rate base.   We hold that the Commission did not abuse its discretion by finding these projects were used and useful in the public service and therefore included in rate base.

---

[23] PECO claims $136,124,000 for its investment in particulate and $SO_2$ removal facilities at its Eddystone coal station, $62,210,000 for its pollution control investment in the Allied and Essex Chemical Company magnesium oxide regeneration facilities which operate in conjunction with the Eddystone and Cromby facilities, and $86,881,-000 investment in pollution control facilities at its Cromby coal station.

[24] These projects include installing of generator condition monitors, remote manual valve operators, meteorlogical equipment, turbine over-speed trip protection, welding receptacle isolation switches, test and air monitoring systems, crusher house heaters, turbines; replacement of wheels, bearings, sodium ion measuring instrumentation, conveyor belt, regenerators, oxygen analyzers, heaters, valves; and provision for gate house, standby fire pump, burner shutoff gates.

[25] These projects include modifications to exhaust vent ducts, containment suppression chamber, waste water treatment; provision for second level voltage protection, technical support center, alternate counting and radio chemical lab; and installation of communications system, and particulate and $SO_2$ removal equipment.

### 5. State Income Tax Normalization

Finally, the Consumer Advocate argues that the Commission's allowing PECO to normalize state income tax benefits is not accordance with the law. This issue is controlled by our recent decision in *Cohen v. Pennsylvania Public Utility Commission,* 76 Pa. Commonwealth Ct. 353, 463 A.2d 1274 (1983). In *Cohen,* we held that normalization of a utility's tax expenses for rate-making purposes was not a prohibited "phantom tax" expense. Since the Commission is free to exercise its discretion and expertise in determining the reasonableness of proposed rates and the claimed expenses which underlie them, the Commission may approve normalization of taxes. As in *Cohen,* the Commission found the evidence favoring normalization to be more persuasive. A PECO witness testified that, under normalization, tax deductions are equitably distributed between present and future ratepayers. Also, there is testimony indicating that normalization produces a reduction in the cost of attracting capital and in the amount of capital that must be attracted. Therefore, the approval of normalization benefits both the Company's financial condition and its ratepayers.

Affirmed.

### Order in 1412 C.D. 1982 and 1422 C.D. 1982

The order of the Pennsylvania Public Utility Commission, entered May 21, 1982 at R-811626, is affirmed.

### Order in 2683 C.D. 1981

The order of the Pennsylvania Public Utility Commission, entered April 24, 1981 at R-80061225, is affirmed.