**Irwin A. POPOWSKY, Consumer Advocate, Petitioner**

v.

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Nov. 3, 2004.

Decided March 14, 2005.

Erin L. Gannon, Asst. Consumer Advocate, Harrisburg, for petitioner.

Carol F. Pennington, Harrisburg, for Intervenor, Office of Small Business Advocate.

Anthony C. DeCusatis, Philadelphia, for Intervenor, Pennsylvania–American Water Company.

Stanley E. Brown, Asst. Counsel, Harrisburg, for respondent.

BEFORE: COLINS, President Judge, McGINLEY, Judge, SMITH–RIBNER, Judge, LEADBETTER, Judge, COHN JUBELIRER, Judge, SIMPSON, Judge, and LEAVITT, Judge.

OPINION BY Judge LEAVITT.

Irwin A. Popowsky (Consumer Advocate) petitions for review of an adjudication of the Pennsylvania Public Utility Commission (PUC) approving a surcharge proposed by Pennsylvania–American Water Company (Utility) as an amendment to its tariff for wastewater collection service. Utility proposed the so-called Collection System Improvement Charge as the mechanism for funding infrastructure improvements to its wastewater collection systems. The Consumer Advocate contends that any rate increase occasioned by Utility's investment in its wastewater systems should not be automatic but, rather, should be established in a base rate proceeding. The central issue in this appeal is whether Section 1307(a) of the Public Utility Code, 66 Pa.C.S. § 1307(a), authorizes a utility to fund infrastructure improvements by automatic rate adjustments.

### The Collection System Wastewater Charge

Historically, Utility has operated as a water utility only, but in recent years it acquired three wastewater systems that serve approximately 13,000 customers.[1] Utility expects that in the years ahead its wastewater operations will be increasing significantly.

In 1995, Utility acquired its wastewater facilities in Monroe County that serve A Pocono Country Place, a residential planned community, and an adjacent commercial area in Coolbaugh Township (hereinafter Monroe System). This system consists of a treatment plant, lift stations[2] and collection mains. Utility has made substantial improvement to the Monroe System since its acquisition, and it plans more for the future.

In March 2001, Utility purchased the wastewater system formerly owned and operated by the City of Coatesville Authority (hereinafter Chester System). This system consists of a processing plant, nine lift stations and an extensive gravity-fed collection network, most of which was installed prior to 1935. In 2003, Utility budgeted approximately $1 million to replace approximately 7,000 feet of deterio-

---

1. The PUC has adopted a policy of fostering the acquisition of troubled systems by larger utilities as a means of correcting or preventing deficiencies in the acquired systems. *See Small Nonviable Water And Wastewater Systems—Statement of Policy,* 52 Pa.Code § 69.711. 66 Pa.C.S. §§ 529 and 1327(a) give the PUC statutory authority to coerce and encourage, respectively, the acquisition of non-viable water and wastewater systems by larger PUC-regulated utilities. Utility asserts that it has acquired numerous water systems that the PUC identified as "troubled," and is now doing the same for wastewater systems.

2. Utility was not entirely clear in its petition on what it meant by a "lift station." In broad terms, a lift station is a facility that lifts sewerage and deposits it to a gravity sewer adjacent to the station. R.R. 546a. The Consumer Advocate's engineer asserted that Utility misused the term "lift station" to refer to a "pumping station." However, the technical literature explains that a lift station is one, of several, types of pumping stations. *See infra* note 11.

rating main and associated manholes and laterals.

In April 2002, Utility acquired the wastewater system formerly owned and operated by the LP Water and Sewer Company (hereinafter Lehman Pike System), serving several residential communities in Pike and Monroe Counties. This is an integrated system that includes a treatment plant, fourteen lift stations and a collection system using various sizes of pipe. Utility's preliminary assessment showed that it would require $2.33 million to address short term problems related to facility deterioration, system unreliability, installation defects and infiltration and inflow.

To fund improvements to these wastewater systems, Utility made a filing on November 26, 2002, petitioning for the PUC's approval of an automatic adjustment clause to its tariff that it named a Collection System Improvement Charge (Wastewater Charge). This charge was modeled after Utility's Distribution System Improvement Charge that had been approved by the PUC to fund capital improvements to its water distribution systems. *See Petitioner of Pennsylvania–American Water Co.*, 85 Pa. P.U.C. 415 (1996). Utility's petition prompted the filing of answers[3] and of consumer complaints, all of which opposed Utility's proposal. In response, the PUC initiated an investigation to determine the reasonableness of Utility's request; suspended the proposed Wastewater Charge for a period of six months; and assigned the matter to an Administrative Law Judge (ALJ) for a hearing and a recommended decision. A technical evidentiary hearing was held, as were several public input sessions. In addition to the PUC's Office of Trial Staff, active participants in the evidentiary hearing included the Consumer Advocate, the Small Business Advocate, and two homeowners' associations for residential communities served by the Monroe System and the Lehman Pike System.

Utility explained in its filing and at the evidentiary hearing that aging infrastructure, the impetus to its Distribution System Improvement Charge, was also behind its request for the Wastewater Charge. According to Utility, the need for infrastructure improvements in the country's wastewater systems has been well-documented by the U.S. Environmental Protection Agency, which estimates that repairs to wastewater collection and treatment systems will cost $122 billion over the next twenty years.

Utility further explained that aged and deteriorated wastewater collection systems allow groundwater and surface runoff to enter the system—a condition known as infiltration and inflow. This infiltration can exceed the carrying capacity of the collection systems, leading to discharges of untreated wastewater. These discharges can contaminate groundwater, transmit water-borne diseases and damage property. Because of these risks to the public health and the environment, the Pennsylvania's Clean Streams Law[4] requires operators of wastewater collection

---

3. The answer of the Office of Trial Staff filed in response to Utility's petition asserted that the proposed tariff supplement was not authorized by the Public Utility Code and should be disapproved. R.R. 52a–55a. Answers filed by the Office of Small Business Advocate and by the Consumer Advocate also asserted that the Public Utility Code did not authorize Utility's Wastewater Charge.

4. Act of June 22, 1937, P.L.1987, *as amended*, 35 P.S. §§ 691.1–691.1001. The applicable regulations implementing the Clean Streams Law are found at 25 Pa.Code §§ 94.2, 94.12(a)(5)-(6).

facilities to do that which is necessary to prevent hydraulic overload. Utility's Vice President of Operations and Manager of Northeast Operations each detailed the deficiencies in each of the three wastewater systems and the repairs needed to satisfy the demands of the Pennsylvania Clean Streams Law.

To fund these repairs, Utility proposed its Wastewater Charge, which it believes to be authorized by Section 1307(a) of the Public Utility Code, 66 Pa.C.S. § 1307(a). Utility's petition stated that the purpose of the surcharge was to enable Utility to "recover the fixed costs (depreciation and pre-tax return) of non-revenue producing, non-expense reducing collection system improvement projects completed and placed in service." R.R. 22a.[5] This method of cost recovery will allow Utility, in its words, "to accelerate the replacement of aging wastewater collection infrastructure [and] to comply with evolving regulatory requirements." *Id.* Utility's petition listed the projects that would be funded by the Wastewater Charge, the most significant being the replacement of collection mains. The initial surcharge would cover projects that had not already been included in Utility's most recent base rate filing; thereafter, the surcharge would be updated quarterly.

Utility explained that with each quarterly update and surcharge increase, Utility would provide supporting data to the PUC's Office of Trial Staff, the Consumer Advocate and the Small Business Advocate ten days prior to its effective date. Annually, the revenue received under the surcharge would be compared to eligible costs for that period; this reconciliation would result in refunds to customers if surcharge revenue exceeded costs. The Wastewater Charge could increase a customer's rate up to 5% of the total invoice, calculated separately for each of the three systems; however, the surcharges could not exceed 5%.

The Consumer Advocate maintained that Utility's evidence did not show that these infrastructure improvements needed to be recovered on an accelerated basis, which was the stated premise to Utility's proposed surcharge. The Monroe and Lehman Pike Systems are relatively new, having been built in the 1970s. The Chester System, most of which was installed prior to 1935, is the oldest system and requires the largest capital infusion. However, when Utility acquired the Chester System, it asserted that it had the financial strength to make system improvements as they developed. *In Re: Pennsylvania–American Water Co.*, 95 Pa. PUC 86, 128 (2001).[6] The Consumer Advocate contended that it was somewhat contradictory for Utility now to claim that it lacked the resources to do these improvements in the absence of the Wastewater Charge. Consumer Advocate also took issue with Utility's claim that regulatory requirements are "evolving," noting

---

5. Utility's petition stated that depreciation expense would be calculated by using the annual accrual rates used in Utility's last base rate case, and the pre-tax return would be calculated using federal and state income tax rates, Utility's "actual capital structure and actual cost rates for long-term debt and preferred stock as of the first day for the three-month period ending one month prior to the effective date of the [Wastewater Charge] and subsequent updates. The cost of equity will be the equity return rate approved in [Utility's] last

fully litigated ... wastewater base rate proceeding for which a final order was entered not more than two years prior to the effective date of the [Wastewater Charge]." R.R. 12a.

6. Notably, the Wastewater Charge would not be applied to customers of the Chester System for several years even though this system of Utility is the oldest, by far, and the one most in need of attention. ALJ Recommended Decision at 2.

that the water quality regulations cited by Utility have not changed since 1998.[7]

The complaining parties also objected to the list of projects to be covered by the Wastewater Charge. Two projects that generated the most controversy were those related to the reduction of infiltration and to the lift stations.

The projects addressing infiltration and inflow are intended to decrease the hydraulic load on treatment facilities. According to the Consumer Advocate, an improved performance of the system will allow new customers to be added, thereby increasing revenue, and will also decrease Utility's expenses.[8] Profits will, thereby, increase. Utility asserted, however, that the projects to be funded by the Wastewater Charge would not decrease expenses because nothing can retard its ever-increasing maintenance expenses un-

til it reduces the average age of its facilities. R.R. 363a.[9] The projects will be revenue neutral because they will not involve extension of new mains to new customers.[10]

Consumer Advocate vigorously contended that lift stations should not be included among the projects to be funded by the surcharge. First, its accounting witness testified that the water utility equivalent, booster stations, had not been approved for inclusion in the DSIC. Second, its engineer testified that Utility did not explain with any precision what it meant by "lift stations." [11] He noted that Utility's petition used the term "lift station" interchangeably with "pumping station" but that this was incorrect on Utility's part because a "lift station" is one type of pumping station.[12] He disagreed with

---

7. Consumer Advocate also noted the regulatory differences between water and wastewater operations. Its witness testified that typically the Pennsylvania Department of Environmental Protection expects that repairs and updates to a wastewater system to be implemented over a five-year period.

8. The central premise to the Wastewater Charge was that the infrastructure improvements would not reduce Utility's expenses and would be revenue neutral.

9. Utility's response did not answer the Consumer Advocate's assertion that the projects to improve Utility's wastewater systems will reduce expenses. The fact that other parts of the systems, or yet-to-be acquired systems, also require repair seems beside the point. Logically, any system improvement should reduce expenses; in the aggregate, the effect may only retard the rate at which expenses increase. This is, nevertheless, a reduction in expenses.

10. "Revenue neutral" is somewhat inapt; the Wastewater Charge will generate more revenue. Utility asserts that this revenue will be offset by expenses. However, this does not account for the pre-tax return and depreciation factors in the Wastewater Charge or for

the fact that Utility will have a more valuable and reliable physical plant after the improvements.

11. A treatise relied upon by the Consumer Advocate, AMERICAN SOCIETY OF CIVIL ENGINEERS MANUALS AND REPORTS ON ENGINEERING PRACTICE No. 37, (1970) at 288 explained:

Two differentiating terms which apply to both sewage and stormwater pumping stations have, by common usage, come to have certain general meanings: (a) lift (relift) station, in which the pumped liquid is released to atmospheric pressure a relatively short distance from the facility into a gravity sewer, open channel, or receiving body; and (b) pumping station, in which the liquid is pumped from the facility some distance, occasionally miles, in a pressure pipe. The term lift station is applied only in the first case while pumping station is applicable to both unless the two are being compared.

R.R. 547a.

12. In support, the Consumer Advocate's engineer witness referred to the "Domestic Wastewater Facilities Manual" adopted by the Pennsylvania Department of Environmental Protection. It identifies four types of pump-

Utility's engineering witness that lift—or pumping—stations in wastewater collection systems differ significantly from booster pumps in water distribution systems. He acknowledged that those pumping stations that are exposed to gases and grit may require more maintenance than booster pumps; however, they last at least 15 years. R.R. 556a. Accordingly, the need for replacement or repair of a lift station would be known with sufficient advance notice to allow Utility to include these costs in a base rate filing.

While the challenge to including certain projects in the Wastewater Charge was vigorous, this was not the focus of the complaining parties. Their central contention was the lack of any statutory authority for Utility to use a surcharge to recover costs associated with capital improvements.[13] These costs, according to the complaining parties, can only be recovered in a base rate case. Absent express statutory authority, which cannot be found in 66 Pa.C.S. § 1307(a), the PUC lacked the authority to approve the Wastewater Charge.[14]

### The Recommended Decision

The ALJ recommended approval of the Wastewater Charge. Acknowledging that the proposal could be viewed as "retroactive rate making," the ALJ, nevertheless, found it preferable to the alternative, which is a base rate proceeding. ALJ

Recommended Decision at 13. Allowing Utility to recover its infrastructure improvement costs by surcharge would eliminate the delays and litigation expenses that are the natural consequence of rate regulation. As noted by the ALJ, the expenses of rate-setting litigation are borne by rate payers. A base rate case is the projection, or estimation, of future expenses and revenues, causing the ALJ to observe: "Rather than make an informed guess, is it not more expedient to track actual costs when incurred?" ALJ Recommended Decision at 13. The ALJ was satisfied that the notice, auditing and reconciliation procedures for implementing the Wastewater Charge would provide a level of regulatory oversight appropriate for the protection of Utility's customers.

The ALJ discounted the Consumer Advocate's objections to the particular projects that would be funded by the Wastewater Charge. First, he noted that the engineer called by Consumer Advocate was not directly familiar with Utility's three systems. Second, he did not believe that by reducing hydraulic overload, Utility would necessarily experience a reduction in expenses. In sum, he found that Utility made its case that its aging systems require ongoing improvements that are appropriately funded by a surcharge mechanism.

Most importantly, the ALJ agreed with Utility that the Wastewater Charge was

ing stations: wet well/dry well, submersible, suction lift and screw lift. Thus, the engineer used the term "pumping stations" in his statement to refer to all four types, which includes "lift stations." R.R. 547a.

**13.** Several suggestions of the complaining parties were accepted by Utility. Penn Vest funded projects were removed from the definition of property eligible for the Wastewater Charge. Utility also agreed that a plant placed in service after December 31, 2000, should be stated at depreciated value, defined

as the net book value at the beginning of the first quarter in which the Wastewater Charge is effective. Finally, Utility agreed that retirements related to eligible construction projects should be netted against the costs of such projects to protect against ratepayers paying for both the old and new plant.

**14.** However, even assuming such authority existed, it was the position of the complaining parties that Utility's evidence did not support a need to fund the proposed infrastructure improvements on an accelerated basis.

authorized by Section 1307(a) of the Public Utility Code, 66 Pa.C.S. § 1307(a). He noted that the PUC had previously held that this provision authorized Utility's Distribution System Improvement Charge. While the PUC's adjudication was on appeal to this Court, the General Assembly adopted Section 1307(g) of the Public Utility Code,[15] which expressly authorizes the Distribution System Improvement Charge. The effect of this statutory amendment was to moot the appeal. The ALJ concluded that in this provision, 66 Pa.C.S. § 1307(g), the legislature did not mean that the funding of infrastructure improvements by a surcharge mechanism was to be limited to water utilities.

## The Adjudication and Appeal

The complaining parties filed exceptions with the PUC. By a vote of 3 to 2, the PUC held that the Wastewater Charge was authorized by 66 Pa.C.S. § 1307(a) and, further, that it was appropriately applied in the circumstance of Utility's aging wastewater collection systems.[16] It noted

that the alternative, a base rate filing, timed to coincide with the completion of construction projects, was "unrealistic." Adjudication at 18. Accordingly, the PUC denied the exceptions, adopted the ALJ's initial decision, approved Utility's surcharge and dismissed the complaints.

The Consumer Advocate then petitioned this Court for review of the PUC's adjudications. Utility and the Small Business Advocate participate in this appeal as intervenors.

■ On appeal,[17] the Consumer Advocate raises four issues. The first three issues can be reduced to one:[18] whether a wastewater utility may recover its investment to replace and upgrade its facilities through a 66 Pa.C.S. § 1307(a) surcharge. In this issue, it is joined by the Small Business Advocate. The final (or second) question raised by the Consumer Advocate is that even if the concept of Utility's Wastewater Charge is authorized by Section 1307(a), the evidence presented by Utility did not satisfy its burden of proving

---

**15.** The text of 66 Pa.C.S. § 1307(g) is found on p. 1158, *infra*.

**16.** The PUC discounted the Consumer Advocate's evidence that booster pumps, not allowed to be recovered in the Distribution System Improvement Charge, were similar to lift, or pumping, stations. Further, the PUC asserted that although booster pumps were not included in Utility's surcharge for its water systems, there was no prohibition against its inclusion. Adjudication at 19.

In addition, the PUC opined that the Consumer Advocate exaggerated the impact of the various projects on Utility's revenue and expense. It was not more specific on this point.

**17.** Our review of a PUC adjudication is limited. We must determine whether constitutional rights were violated, an error of law was committed or whether the critical findings of fact are supported by substantial evidence. *Popowsky v. Pennsylvania Public Utility Commission*, 853 A.2d 1097 (Pa.Cmwlth.2004).

Rate-making questions require the exercise of the PUC's expertise, and reviewing courts tend to defer to the PUC's exercise of discretion in that area. *Philadelphia Suburban Water Company v. Pennsylvania Public Utility Commission*, 808 A.2d 1044 (Pa.Cmwlth. 2002).

**18.** Specifically, the Consumer Advocate frames the issues as follows: (1) whether the PUC erred in approving the Wastewater Charge because this type of surcharge is available only to water utilities; (2) whether the PUC erred because the Wastewater Charge will allow Utility to collect a return on and depreciation of a utility plant without first demonstrating that the plant is used and useful; (3) whether the PUC erred because a rate increase granting Utility a return on and depreciation of a utility plant can only be allowed by a Section 1308 base rate filing; and (4) whether the PUC erred in concluding that the record supported a need for accelerated recovery of Utility's costs in improving its wastewater systems.

that the specific projects covered by the surcharge needed to be recovered on an accelerated basis.

■ A surcharge is an amount added to a customer's regular bill that is established outside the normal ratemaking procedure. *Pennsylvania Industrial Energy Coalition v. Pennsylvania Public Utility Commission (PUC)*, 653 A.2d 1336, 1341 (Pa. Cmwlth.1995). The surcharge is imposed pursuant to an "automatic adjustment clause" in a utility's approved tariff. *Id.* The surcharge allows the add-on of expenses and changes to those expenses, without including any profit or other recovery; this add-on is known as "dollar for dollar" recovery. *Id.*

The surcharge is quite different from a base rate. In Pennsylvania, as in most jurisdictions, rates for public utilities are set using what is known as the test year concept, which requires taking a snapshot of the utility's revenues, expenses and capital costs during a one-year period. *Green v. Pennsylvania Public Utility Commission*, 81 Pa.Cmwlth. 55, 473 A.2d 209, 213–

215 (1984). The object of using a test year is to reflect typical conditions. *City of Pittsburgh v. Pennsylvania Public Utility Commission*, 178 Pa.Super. 46, 112 A.2d 826, 832 (1955).[19] Test year expenses may be adjusted or normalized where atypical or non-recurring. *Pennsylvania Public Utility Commission v. Pennsylvania Power Company*, 85 PUR 4th 323, 379 (1987). Under the test year concept, revenues, expenses and capital costs are to be simultaneously reviewed for the same period of time so that a utility may prove its new rates are "just and reasonable." 66 Pa. C.S. § 315(a).[20]

■ The Consumer Advocate contends that the Wastewater Charge is nothing but a form of piecemeal ratemaking that violates the matching principle embedded in the test year concept. 66 Pa.C.S. § 315(e).[21] Only one element of the base rate, *i.e.,* capital investment, is considered. Thus, the effect of the Wastewater Charge is to change a line item in Utility's base rate to account for expenses attributable to capital investment, while ignoring the other components of the base rate.[22] This can

---

**19.** A future test year is one means of dealing with the problem of attrition, in that it permits the regulator to adjust historic test year data for both known and measurable and projected changes. Phillips, THE REGULATION OF PUBLIC UTILITIES, (3rd ed.1993) at 407. Again, however, even with the use of a future test year, all elements of the ratemaking formula are to be considered together to arrive at a reasonable level of rate going forward.

**20.** It states:

(a) **Reasonableness of rates.**—In any proceeding upon the motion of the commission, involving any proposed or existing rate of any public utility, or in any proceedings upon complaint involving any proposed increase in rates, the burden of proof to show *that the rate involved is just and reasonable* shall be upon the public utility. 66 Pa.C.S. § 315(a)

**21.** It states:

**Use of future test year.**—In discharging its burden of proof the utility may utilize a future test year. The commission shall promptly adopt rules and regulations regarding the information and data to be submitted when and if a future test period is to be utilized. Whenever a utility utilizes a future test year in any rate proceeding ... the utility shall provide, as specified by the commission in its final order, appropriate data evidencing the accuracy of the estimates contained in the future test year, and the commission may after reasonable notice and hearing, in its discretion, adjust the utility's rates on the basis of such data. 66 Pa.C.S. § 315(e).

**22.** This is also called a "single issue" rate filing. This argument was also advanced by the Small Business Advocate at the PUC proceeding. A single issue rate making is prohibited if it impacts on a matter considered in a base rate case. *Philadelphia Electric Company v. Pennsylvania Public Utility Commis-*

result in an unjust and unreasonable rate if, for example, other factors demonstrate that the rate is excessive and needs to be reduced.

■ Consumer Advocate also contends that the Wastewater Charge is nothing more than improper retroactive ratemaking.[23] A utility that has failed to project expenses and revenue in its base rate cannot effect an after-the-fact correction by refunds to customers, where profits are higher than predicted, or by rate increases, in the obverse situation. *Philadelphia Electric Company*, 502 A.2d at 727–728. However,

> [a]n exception to this rule in the case of retroactive recovery of unanticipated expenses has been recognized where the expenses are extraordinary and nonrecurring.

*Id.* at 728. Consumer Advocate contends that Utility has not demonstrated that its expenses are either unanticipated or extraordinary.[24] Aging mains are to be expected, and a utility's expenses to attend to their repair or replacement are ordinary and recurring. In this particular case, Utility only recently acquired these wastewater systems: their condition must have been discovered during Utility's due diligence. Finally, Consumer Advocate notes, the notion that these repairs cannot be appropriately addressed in a base rate case is belied by the fact that Utility's 2000 base rate case for its wastewater systems specifically included amounts needed for planned repairs to the wastewater systems.

In response, Utility contends that the Wastewater Charge will allow it to increase its investment in its systems "by mitigating the attrition that would necessarily occur if fixed costs of such non-revenue producing, non-expense reducing investment could be recovered only by a base rate filing under Section 1308 of the Public Utility Code (66 Pa.C.S. § 1308)." Utility Brief at 16. Further, the existence of the Wastewater Charge will mean that Utility can extend the period of time between each base rate filing.

■ The question presented by this appeal is an important one with significance for all Pennsylvania utilities and their customers in light of the fact that infrastructure fatigue is inevitable for every utility's facilities. That question is whether Section 1307(a) of the Public Utility Code allows a utility to recover its costs for

---

sion, 93 Pa.Cmwlth. 410, 502 A.2d 722, 727–728 (1985).

**23.** Section 1308(a) of the Public Utility Code requires, *inter alia*, a utility to give 60–day advance notice of a rate change, unless the PUC allows the utility to dispense with that notice. It states, in relevant part, as follows:

> Unless the commission otherwise orders, *no public utility shall make any change in any existing and duly established rate, except after 60 days notice*, to the commission, which notice shall plainly state the changes proposed to be made in the rates then in force, and the time when the changed rates will go into effect.... All proposed changes shall be shown by filing new tariffs, or supplements to existing tariffs filed and in

force at the time. The commission, for good cause shown, may allow changes in rates, without requiring the 60 days notice, under such conditions as it may prescribe. 66 Pa.C.S. § 1308(a) (emphasis added). Although the 60–day advance notice may be contracted, retroactive rate making is not contemplated.

**24.** This Court has held that extraordinary expenses are "not merely unanticipated but also 'a substantial, one-time expense or a substantial item that will not appear as a continuing expense and could otherwise never be recovered in rates because, like the weather-related expenses, it would be normalized out of the test year as abnormal." *Popowsky v. Pennsylvania Public Utility Commission*, 164 Pa. Cmwlth. 338, 642 A.2d 648, 652 (1994).

repairing infrastructure by automatic rate adjustment.

### Section 1307(a) of the Public Utility Code

The ability of a utility to use a surcharge as the way to increase rates has been expressly authorized by the General Assembly. Section 1307(a) of the Public Utility Code provides in pertinent part as follows:

> (a) **General rule.**—*Any public utility,* except common carriers and those natural gas distributors with gross intrastate annual operating revenues in excess of $40,000,000 with respect to the gas costs of such natural gas distributors, *may establish a sliding scale of rates* or such other method *for the automatic adjustment of the rates of the public utility as shall provide a just and reasonable return on the rate base of such public utility, to be determined upon such equitable or reasonable basis as shall provide such fair return.* A tariff showing the scale of rates under such arrangement shall first be filed with the commission, and such tariff, and each rate set out therein, approved by it. The commission may revoke its approval at any time and fix other rates for any such public utility if, after notice and hearing, the commission finds the existing rates unjust or unreasonable.

66 Pa.C.S. § 1307(a) (emphasis added). As acknowledged by the PUC in its 1996 adjudication on Utility's Distribution System Wastewater Charge, Section 1307(a) surcharges have been used principally by gas and electric companies to recover certain expenses not covered in their base rates;[25] expenses appropriate for surcharge recovery are those that are easily determined, beyond the utility's control or required by a government entity. *Petition of Pennsylvania–American Water Co.,* Docket No. P–00961031, Order entered August 26, 1996, at 9.[26] Examples include expenses incurred to convert oil-fired plants to gas, principal and interest due on Penn Vest obligations, and incremental changes in state tax rates. *Id.* Section 1307(a) surcharges have also been used by electric utilities to recover their expenses relating to the implementation of demand-side management programs (DSM) that

**25.** This point was also made by this Court in *PIEC*, 653 A.2d at 1348. We noted that Section 1307(e) through (f) specifically authorize surcharges for the recovery of fuel costs. *Id.* As explained by the Small Business Advocate in its brief, the PUC has adopted regulations or statements of policy that specify the type of expenditures that can be recovered by surcharge. One example is the recovery of "take or pay" costs imposed on local gas distributors by interstate pipeline suppliers under procedures and regulations established by the Federal Energy Regulatory Commission. *See* 52 Pa.Code § 69.191; 52 Pa.Code § 69.341(b)(4); *National Fuel Gas Distribution Corp. v. Pennsylvania Public Utility Commission,* 677 A.2d 861, 865–867 (Pa.Cmwlth. 1996). Expenditures that are required by government can be recovered by surcharge, such as principal and interest on PennVest loans, 52 Pa.Code § 69.363, and incremental state tax increases, 52 Pa.Code § 54.93,

69.53. Finally, surcharges may be used where permitted by statute, as in 66 Pa.C.S. §§ 1319, 1307(g). Small Business Advocate Brief at 17.

**26.** This adjudication was included as Appendix C, Brief of Small Business Advocate. In this adjudication, the PUC approved Utility's Distribution System Wastewater Charge pursuant to 66 Pa.C.S. § 1307(a). The PUC's reasoning in this 1996 adjudication is important because the PUC relied upon that reasoning to justify its authority to approve the Wastewater Charge in the adjudication *sub judice.* Specifically, in the 1996 adjudication, the PUC concluded that it had the authority to permit Utility to institute a surcharge under Section 1307(a) to recover depreciation and a pre-tax return on water system improvements made between base rate cases.

were required by statute. *PIEC*, 653 A.2d at 1350.

In *PIEC*, this Court considered the scope and meaning of Section 1307(a), distinguishing it from Section 1308 of the Public Utility Code,[27] which authorizes utilities to increase rates by making a base rate filing. This Court determined, and the Supreme Court affirmed,[28] that Section 1307(a) allowed electric utilities to recover certain DSM expenses by surcharge. However, we limited the use of Section 1307(a) to the recovery of non-capital expenses. Thus, we affirmed the PUC's adjudication, except to that part

[a]llowing recovery of incentives and *costs of physical facilities* through the surcharge mechanism and adopting the calculation for incentives, which is reversed.

*PIEC*, 653 A.2d at 1353 (emphasis added). We so ruled because a Section 1307(a) surcharge "flows through only expenses and changes to those expenses without including any profit or other recovery." *PIEC*, 653 A.2d at 1341. By contrast, improvements to physical facilities leave a utility with a more valuable capital asset.

Central to our holding in *PIEC* was the statutory authority for the surcharge that was found in Section 1319 of the Public Utility Code, 66 Pa.C.S. § 1319. We explained that

[b]ecause Section 1319 directs the PUC to allow recovery of all prudent and reasonable costs for developing, managing, financing and operating DSM programs and because Section 1307 gives the PUC the discretion to establish by either regulations or order the manner in which automatic adjustment recovery may be instituted and when such automatic adjustment of rates should be mandated, *the surcharge method is permitted.*

*PIEC*, 653 A.2d at 1349 (emphasis added). Nevertheless, as noted, we refused to allow Section 1307(a) to be used to recover the costs of new physical utility facilities, even if those capital expenses related to DSM requirements. We reasoned that the "used and useful" principle enunciated in 66 Pa.C.S. § 1315,[29] prevented the inclusion of capital improvements in a surcharge, explaining that

[b]ecause new physical facilities are appropriate costs only within the rate base under Section 1315, in the unlikely event that DSM programs require *new physical facilities, those costs should be raised in a base rate case only,* subject to the restrictions of Section 1315, and not through the surcharge mechanism.

*PIEC*, 653 A.2d at 1347 (emphasis added).

Prior to *PIEC*, this Court addressed the difference between a base rate and surcharge in *Masthope Rapids Property*

27. 66 Pa.C.S. § 1308(a) states in relevant part:

Unless the commission otherwise orders, no public utility shall make any change in any existing and duly established rate, except after 60 days notice to the commission, which notice shall plainly state the changes proposed to be made in the rates then in force, and the time when the changed rates will go into effect.

\* \* \*

All proposed changes shall be shown by filing new tariffs, or supplements to existing tariffs filed and in force at the time.

28. Our Supreme Court affirmed this Court in a *per curiam* order at *PIEC*, 543 Pa. 307, 670 A.2d 1152 (1996).

29. In pertinent part, Section 1315 provides that revenue-producing, expense-reducing investment in new facilities by an electric utility "shall not be made part of the rate base nor otherwise included in the rates charged by the electric utility until such time as the facility is used and useful in service to the public." 66 Pa.C.S. § 1315.

*Owners Council v. Pennsylvania Public Utility Commission,* 135 Pa.Cmwlth. 437, 581 A.2d 994 (Pa.Cmwlth.1990) and in *National Fuel Gas Distribution Corp. v. Pennsylvania Public Utility Commission,* 677 A.2d 861 (Pa.Cmwlth.1996). In *Masthope,* a water utility sought to use a Section 1307(a) surcharge to recover expenses related to principal and interest payments on a loan financed under the Water Facilities Restoration Act (Water Act), 32 Pa.C.S. § 7501–7518.[30] This Court held that a surcharge was not available as the means for funding Water Act loan repayments.[31] We held that rate increases required for repayment of Water Act loans had to be thoroughly reviewed prior to implementation, as is done in every base rate case. By contrast, a surcharge involves, at most, a "preliminary and cursory" review. *Id.* at 1000. We explained:

> Indeed, the very function of *the typical automatic adjustment clause is to permit rapid recovery of a specific, identifiable expense item,* with a more comprehensive analysis upon reconciliation of actual costs with previously projected costs used to establish the effective rate. *The initial process is essentially a mathematical review of the projections provided by the public utility.* Therefore, there is no initial review to determine the appropriateness or necessity of the rate request.

*Masthope,* 581 A.2d at 1000 (emphasis added).[32]

Utility's Wastewater Charge will entail regulatory oversight that amounts to no more than a mathematical exercise. The after-the-fact audit will require Utility to show only that it did, in actuality, spend the funds for the intended purpose and not, for example, that a new pumping station was needed and was operating effectively. *PIEC,* 653 A.2d at 1347. Utility will recover a return and depreciation allowance on new manholes simply by presenting its expenditures, even if the replacement manhole covers are constructed of solid gold. As explained in *Masthope,* the surcharge is appropriate for expenses easily determined. Here, by contrast, Utility will recover capital costs for projects, which may or may not be useful to customers, as well as a factor for depreciation and profit.

*Masthope* and *PIEC* teach that the "cursory" review undertaken for a surcharge is not a substitute for the review undertaken in a base rate case to determine whether a rate is just and reasonable. *Masthope,* 581 A.2d at 1001. With respect to capital cost recovery, that review requires a utility to prove that those costs were incurred for used and useful facilities. Those costs may not be recovered *"until such time* as the facility is used and useful in service to the public." *PIEC,* 653 A.2d at 1346 (em-

---

**30.** The Water Facilities Restoration Act made public financing available to municipalities and to water supply companies to extend, repair and improve their water systems. The Act required that the PUC establish expedited approval of rate relief needed to repay these loans. 32 Pa.C.S. § 7518.

**31.** As we noted in *PIEC,* it was the absence of express statutory authority that led us to conclude in *Masthope,* that the Water Act loan repayments could not be recovered by surcharge. *PIEC,* 653 A.2d at 1349.

**32.** The Court specified that the Water Act requirement, 32 Pa.C.S. § 7518, must be read *in pari materia* with the legal obligations of the PUC, as mandated in the Public Utility Code and specifically the requirement of Section 1301 that "[e]very rate ... shall be just and reasonable." *Masthope,* 581 A.2d at 1000–1001. "When attempting to set these 'just and reasonable' rates, the Commission is guided by general ratemaking principles, including the" " 'used and useful' principle." *Masthope,* 581 A.2d at 1001.

phasis added). That time is in a Section 1308 base rate proceeding.

With respect to the Wastewater Charge, the PUC ignored *Masthope* and reasoned that our analysis in *PIEC* did not apply. The PUC attempted to distinguish *PIEC*, noting that the issue there was the meaning of Section 1315 of the Public Utility Code, which by its own terms applies only to electric utilities. This attempt to side-step the precedent set by *PIEC* is not persuasive.

First, our Supreme Court has held that the principle codified in Section 1315, *i.e.*, that a utility may not recover costs of facilities not presently used and useful in providing services, applies to all Pennsylvania utilities. In *Barasch v. Pennsylvania Public Utility Commission*, 516 Pa. 142, 169, 532 A.2d 325, 338 (1987), our Supreme Court held as follows:

> Given what we have already said about the fundamental principles of this state's public utility jurisprudence, it should be clear that *no utility of any type is permitted*, without express and valid legislative authorization, to *charge ratepayers for property which is not used and useful in the production of current utility service.*

*Id.* (emphasis added). The Supreme Court also specified that the principle applied to all utility capital expenditures, "regardless of whatever convenient accounting label the utility might employ to characterize a nonqualifying outlay." *Barasch*, 516 Pa. at 166, 532 A.2d at 337. In other words, a rate is not "just and reasonable," as required under 66 Pa.C.S. § 315(a), if it requires ratepayers to reimburse a utility for capital investments that are neither used nor useful.

Second, this argument of the PUC that the "used and useful" requirement is applicable only to electric utilities has been tried before by the PUC and soundly rejected. In *Barasch v. Pennsylvania Public Utility Commission (Factoryville)*, 127 Pa.Cmwlth. 544, 562 A.2d 414, 416–417 (1989),[33] we stated:

> It is clear that *Barasch* first is a restatement in case law of the long-held premise that property owned by a utility may not be included in its rate base unless is it used and useful in the public service.

*Id.* at 416. The PUC seeks to repeat *Factoryville* error here, but, again, we decline to permit it. An investment in a facility cannot be recovered until that facility is proven to be used and useful.[34]

Because a Section 1307(a) surcharge provides no opportunity for a utility to demonstrate that its system improvements are both used and useful prior to recovering these capital costs,[35] this surcharge cannot be used to fund capital improve-

---

**33.** *Factoryville* involved a water utility's request to recover the costs of a contaminated well and construction of a new storage tank, which were not presently used and useful. *Factoryville*, 562 A.2d at 414.

**34.** Judge Simpson argues in his dissent that the used and useful analysis need only be undertaken for new facilities at the time of initial installation. This fails to account for the fact that a replaced facility is new and its cost may far exceed the cost of the original facility.

**35.** Notably, Utility's inclusion of language in Wastewater Charge Tariff that limits eligible plant to additions that are "placed in service," R.R. 22a, does not circumvent the requirement that the Utility carry the burden of proving that the plant is, in fact, used and useful prior to recovering rates. In other words, there will be nonsubstantive prudence or "used and useful" review of the plant included in the Wastewater Charge prior to recovery of the return (profit) and depreciation on that plant. Nor is there any consideration of offsetting costs or revenues, such as recent reductions in interest rates, that would be considered in a base rate proceeding.

ments. The PUC's approval of the Wastewater Charge pursuant to Section 1307(a) of the Public Utility Code would allow Utility to recover its capital expenditures with only an initial and cursory review. This result cannot be reconciled with this Court's holdings in *PIEC, Masthope* and *Factoryville,* which interpreted the scope of Section 1307(a).

To be sure, the General Assembly has authority to exempt utilities from making the used and useful demonstration before recovering its capital expenditures. As noted, by amendment to Section 1307, the legislature has expressly authorized water utilities to recoup these expenses by surcharge. Section 1307(g) of the Public Utility Code states:

> **(g) Recovery of costs related to distribution system improvement projects designed to enhance water quality, fire protection reliability and long-term system viability.**—Water utilities may file tariffs establishing a sliding scale of rates or other method for the automatic adjustment of the rates of the water utility as shall provide for recovery of the fixed costs (depreciation and pretax return) of certain distribution system improvement projects, as approved by the commission, that are completed and placed in service between base rate proceedings. The commission, by regulation or order, shall prescribe the specific procedures to be followed in establishing the sliding scale or other automatic adjustment method.

66 Pa.C.S. § 1307(g) (emphasis added). The legislative intent is clear: water utilities may recover certain capital costs through an automatic adjustment clause in its tariff.

It is equally clear that this statutory provision is limited to "distribution system improvement projects designed to enhance water quality." *Id.* Section 1307(g) does

not authorize the automatic recovery of the costs of system improvement projects for electric, natural gas, steam and wastewater utilities. This point was made by Commissioner Pizzingrilli, who explained in her dissent:

> While, arguably, Section 1307(a) of the Public Utility Code seems to give the Commission broad authority to implement an automatic adjustment of rates for a seemingly expansive variety of reasons, this subsection must be read in context with the other remaining provisions of Section 1307. In 1996, the General Assembly enacted Section 1307(g) which specifically permits water utilities to recover certain infrastructure improvement costs through the implementation of sliding scale of rates or other method for the automatic adjustment of rates. *However, the General Assembly did not include any other utilities in this provision* and, as a result, I do not believe that the statute provides the authority to adopt the [Wastewater Charge].

Adjudication, Statement of Commissioner Pizzingrilli at 1 (emphasis added).

It is unmistakable that the Wastewater Charge is not authorized by Section 1307(g) because the projects involved here have nothing to do with the distribution of water, and Utility acts not as a water utility but, rather, as a wastewater utility. The PUC majority dealt with the absence of terms relating to sewerage collection in Section 1307(g) by reasoning that its authority to approve the Wastewater Charge stemmed from the broad language of Section 1307(a). It explained that by enacting Section 1307(g) the General Assembly simply "reaffirmed the Commission's pre-existing authority" to permit recovery of those costs. Adjudication at 16. There are several flaws to this position.

First, the PUC's interpretation renders Section 1307(g) mere surplusage if it is correct that Section 1307(a) is broad enough to authorize a surcharge for capital improvements to a water system. However, the General Assembly intends that a statute "be construed, if possible, to give effect to all its provisions," lest a provision be rendered mere surplusage. 1 Pa.C.S. § 1921(a); *Nelson v. State Board of Veterinary Medicine*, 863 A.2d 129 (Pa.Cmwlth. 2004). The General Assembly did not believe that Section 1307(a) provided the authorization to use a surcharge to make improvements to a water distribution system and, therefore, enacted Section 1307(g).

■ Second, the principle expressed in the maxim *expressio unius est exclusio alterius* defeats the PUC's proffered construction. Under this doctrine, the inclusion of a specific matter in a statute implies the exclusion of other matters. *Atcovitz v. Gulph Mills Tennis Club, Inc.*, 571 Pa. 580, 812 A.2d 1218 (2002). Section 1307(g) is limited in scope. The

General Assembly could have set forth a list of projects and utilities that could fund infrastructure improvements by surcharge, but it did not. We must find that the legislature intended to limit the use of the surcharge. It did not intend that all utilities could fund capital improvements by a surcharge.

Finally, we must read together all the provisions of the Public Utility Code that relate to rate making. 1 Pa.C.S. § 1921(a). A general rate increase is one that affects 5% of customers and can increase rates by 3%. 66 Pa.C.S. § 1308(d).[36] Here, the Wastewater Charge affects all customers, and it can increase rates by 5%. The legislature has provided that such increases be established by a Section 1308 base rate case. *Masthope*, 581 A.2d at 999.

■ In sum, Section 1307(g) cannot be reduced to a mere confirmation of what Section 1307(a) had already allowed.[37] This is not logical. The way to "clarify" or "confirm" the meaning of Section 1307(a) is by amending Section 1307(a).[38] Indeed,

---

**36.** It states in relevant part:

As used in this part *general rate increase* means a tariff filing which affects more than 5% of the customers and amounts to in excess of 3% of the total gross annual intrastate operating revenues of the public utility. If the public utility furnishes two or more types of service, the foregoing percentages shall be determined only on the basis of the customers receiving, and the revenues derived from, the type of service to which the tariff filing pertains.

66 Pa.C.S. § 1308(d) (emphasis added).

**37.** The PUC argues that Section 1307(g) requires it to approve a water utility's surcharge for distribution system improvement. It explains that prior to the enactment of Section 1307(g), the PUC had the discretion to approve such a surcharge, or not, under Section 1307(a). This is a strange argument, and it is wrong. The legislature must establish the standards for an agency's exercise of discretion. Otherwise, the statute effects an uncon-

stitutional delegation of legislative authority. Pa. Const. art. 2, § 1; *Bell Telephone Co. of Pennsylvania v. Driscoll*, 343 Pa. 109, 21 A.2d 912 (1941) (wherein a provision of the Public Utility Law was found to be an unconstitutional delegation of legislative authority because it failed to guide the exercise of the Public Utility Commission's discretion in deciding when to approve, or disapprove, a utility's contract with its affiliate). Here, the PUC argues that it decides when capital cost can be recovered by surcharge and when it must be done in a base rate proceeding. Because the PUC argues for an unconstitutional interpretation of Section 1307(a), it must be rejected.

**38.** Judge Simpson argues that the plain language of Section 1307(a) is broad enough to cover the Wastewater Charge. However, the language of Section 1308(a) is equally plain that a rate change requires the utility to file a new tariff and to give the PUC and the public 60–day advance notice of the changes to an

the enactment of 1307(g) is strong evidence that Section 1307(a) does not permit any utility to fund capital improvements by surcharge.[39] The "clarification" here is that Section 1307(a) does not allow that which Section 1307(g) allows; this is why the General Assembly found it necessary to enact Section 1307(g).

■ We hold that where a utility seeks to effect a general rate increase, a base rate case must be filed pursuant to Section 1308 of the Public Utility Code. Rate adjustments, or surcharges, submitted pursuant to Section 1307(a) are limited in scope and not to be employed as a universally available alternative to a base rate case. As we have previously held, a Section 1307(a) automatic rate adjustment is appropriate where expressly authorized, as in 66 Pa. C.S. § 1307(g), or for easily identifiable expenses that are beyond a utility's control, such as tax rate changes or changes in the costs of fuel.

## Conclusion

The PUC's belief that there is no limit on its authority to approve the use of a surcharge as the means for any utility to recover its costs for any facility addition is contrary to precedent and to sound principles of statutory construction. It means that utilities can recover their capital costs without any incentive to invest wisely and efficiently. Indeed, when recovery is allowed on a cost-plus basis, the incentive is otherwise because the return factor is calculated as a percentage of the capital cost. The PUC's stated basis for approving the Wastewater Charge is that the rate-making process is slow, expensive and cumbersome. That may be the case. The answer is not to allow rates to be set piecemeal by Section 1307(a) surcharges, but, rather, to reform the procedures for base rate cases. Alternatively, the General Assembly may decide that a utility's costs for responding to infrastructure fatigue requires a special rate-making procedure, whether by surcharge or some other mechanism. This important matter needs to be addressed by the General Assembly. It is not for the PUC and not for the courts to devise a social policy that conflicts with decisions of the General Assembly that have been made and are firmly expressed in the Public Utility Code.

For these reasons, we reverse.[40]

## ORDER

AND NOW, this 14th day of March, 2005, the adjudication of the Pennsylvania Public Utility Commission in the above-captioned matter is hereby reversed.

Dissenting Opinion by President Judge COLINS.

I wish to indicate that I join fully in the dissenting opinion of Judge Simpson.

---

existing tariff. The task is to read these provisions together. We believe, therefore, that a rate "adjustment" must be limited in scope and not an alternative to the filing of a new tariff.

**39.** Notably, a bill was introduced in the House of Representatives to authorize natural gas utilities to recover investment in its plants by using a Section 1307(a) surcharge. H.B. 2754, Printers No. 4278. The bill was rejected by a vote of 166–28 on July 7, 2003. H.R. 1660, A.2623, 57 Pa. Legis. J. 1334, 1340.

**40.** In light of our holding that 66 Pa.C.S. § 1307(a) does not authorize a utility to use a surcharge to recover its capital costs, incurred in making infrastructure improvements, we need not address the issues raised by Consumer Advocate as to whether the record supported the application of a surcharge in this case. Because we do not reach this issue, we are puzzled by the dissent of President Judge Colins, which asserts that the majority has engaged in fact-finding and has impermissibly substituted its judgment for the PUC. The majority opinion construes the Public Utility Code, and this is an exercise of our plenary review responsibility.

Further, I wish to state my belief that the majority is substituting its judgment for that of the Pennsylvania Public Utility Commission (PUC), as well as engaging in unauthorized fact finding. As indicated by Judge Simpson, the plain language of the "general rule" mandates an affirmance of the PUC's action.

Judge SIMPSON joins in this dissent.

Dissenting Opinion by Judge SIMPSON.

Although the majority opinion is exquisitely researched and beautifully written, I respectfully disagree with its conclusions. As more fully discussed below, I believe the plain language of the "general rule," Section 1307(a) of the Public Utility Code (Code), 66 Pa.C.S. § 1307(a), grants the Public Utility Commission (PUC) authority to approve surcharges, including the one it approved here. Therefore, I would affirm.

### I. Statutory Provisions

Section 1307 of the Code provides in pertinent part (with emphasis added):

(a) **General rule.**—*Any public utility*, except common carriers and those natural gas distributors with gross intrastate annual operating revenues in excess of $40,000,000 with respect to the gas costs of such natural gas distributors, may establish a sliding scale of rates or such other method for the *automatic adjustment of the rates of the public utility as shall provide a just and reasonable return on the rate base of such public utility, to be determined upon such equitable or reasonable basis as shall provide such fair return.* A tariff showing the scale of rates under such arrangement shall first be filed with the commission, and such tariff, and each rate set out therein, approved by it. The commission may revoke its approval at any time and fix other rates

for any such public utility if, after notice and hearing, the commission finds the existing rates unjust or unreasonable.

(b) **Mandatory system for automatic adjustment.**—The commission, by regulation or order, upon reasonable notice and after hearing, may prescribe for any class of public utilities, except common carriers and those natural gas distributors with gross intrastate annual operating revenues in excess of $ 40,000,000, a mandatory system for the automatic adjustment of their rates, by means of a sliding scale of rates or other method, on the same basis as provided in subsection (a), to become effective when and in the manner prescribed in such regulation or order. Every such public utility shall, within such time as shall be prescribed by the commission, file tariffs showing the rates established in accordance with such regulation or order.

Section 1307 also specifically allows the recovery of fuel costs, including natural gas, through automatic adjustment procedures in subsections (c) and (f). 66 Pa. C.S. § 1307(c), (f). In subsection (e), the General Assembly provided a year-end adjustment of recovery based on the total of actual expenses for the period as compared to the projected expenses used to determine the charge. After a public hearing on the report of adjustments needed, the PUC is given the authority to order a refund to customers if the charges exceeded the actual expenses. 66 Pa.C.S. § 1307(e); *Pennsylvania Indus. Energy Coalition v. Pennsylvania Pub. Util. Comm'n (PIEC)*, 653 A.2d 1336 (Pa. Cmwlth.1995), *aff'd per curiam*, 543 Pa. 307 670 A.2d 1152 (1996). Also relevant here is subsection (g):

(g) **Recovery of costs related to distribution system improvement projects designed to enhance water quali-**

ty, fire protection reliability and long-term system viability.—*Water utilities* may file tariffs establishing a sliding scale of rates or other method for the automatic adjustment of the rates of the water utility as shall provide for recovery of the fixed costs (depreciation and pretax return) of certain *distribution system improvement projects,* as approved by the commission, that are completed and placed in service between base rate proceedings. The commission, by regulation or order, shall prescribe the specific procedures to be followed in establishing the sliding scale or other automatic adjustment method.

66 Pa.C.S. § 1307(g)(emphasis added).[1]

## A. Plain Language

The PUC concluded the plain language of the "general rule" in subsection (a) empowered it to approve the collection system improvement surcharge. PUC Adjudication at 12.

In general, the interpretation of a statute is a question of law, *Tritt v. Cortes,* 578 Pa. 317, 851 A.2d 903 (2004), with the objective being to ascertain and effectuate the intent of the General Assembly. *Id.; see* 1 Pa.C.S. § 1921(a). In this regard, the plain language of a statute is the foremost indication of legislative intent. *Tritt.* When assessing ambiguity, we may consider whether a separate provision is contrary to or inconsistent with the provision in question. *Id.* (comparison of education requirement for new applicants with reappointment requirements for those already commissioned under amended Notary Public Law). When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the

pretext of pursuing its spirit. 1 Pa.C.S. § 1921(b).

In my view, the plain language of the "general rule" permits applications for automatic adjustments of rates from "[a]ny public utility," save certain limitations not here pertinent. The only limitation on the terms of the automatic adjustment is that it shall "provide a just and reasonable return on the rate base of such public utility, to be determined on such equitable or reasonable basis as shall provide such fair return." Thus, there is little express limitation on the type of public utility authorized to apply, and there is no express limitation on the type, location, timing or amount of expense which may be the basis for adjustment.

The plain language in subsection (g) is not inconsistent with this provision. Subsection (g) is limited to water utilities. Also, subsection (g) limits the type of expenses which may be considered, as only "fixed costs (depreciation and pretax return) of certain distribution improvement projects" may be recovered. Further, there is a time limit on the automatic adjustment, which is limited to recover costs for projects "placed in service between base rate proceedings."

Subsection (g) does not limit the "general rule" beyond its terms. Rather, subsection (g) limits a utility's ability to request surcharge based on fixed costs of certain water distribution improvement projects. Neither the plain language of the "general rule" nor the plain language of the particular rule in subsection (g) restricts surcharge recovery of costs for wastewater collection system improvements. Therefore, nothing in the plain language of the statute contradicts the PUC's conclusion as to statutory authorization.

---

1. Section 1 of the Act of December 18, 1996, P.L. 1061, amended Section 1307 of the Code to add language of subsection (g).

Unfortunately, the majority opinion does not undertake a plain language analysis. This is the primary reason for my disagreement.

The majority appropriately questions the purpose of subsection (g) if not to express new authority not otherwise existing. However, the answer to this question is found in the majority opinion, where it discusses the circumstances in which subsection (g) was adopted:

[The ALJ] noted that the PUC had previously held that [the "general rule" provision of Section 1307(a)] authorized Utility's Distribution System Improvement Charge. While the PUC's adjudication was on appeal to this Court, the General Assembly adopted Section 1307(g) of the Public Utility Code, which expressly authorizes the Distribution System Improvement Charge. *The effect of this statutory amendment was to moot the appeal.* The ALJ concluded that in this provision, 66 Pa.C.S. § 1307(g), the legislature did not mean that the funding of infrastructure improvements by a surcharge mechanism was to be limited to water utilities.

Op. at 1151 (footnote omitted, emphasis added). Clearly, the purpose of subsection (g) was to moot an appeal over "general rule" authority already exercised by the PUC. At the very least, these circumstances invite a plain language analysis of the "general rule."

### B. Statutory Construction

Assuming for present purposes there exists an inconsistency between the subsections, I reach the same result by using principles of statutory construction. Thus, one may presume that the General Assembly intended the entire statute to be effective and certain. 1 Pa.C.S. § 1922(2). That can be accomplished by reading the "general rule" as being generally applicable and the particular provision of subsection (g) as being an exception to the general rule. The same conclusion is reached by considering the heading entitled "general rule." *See* 1 Pa.C.S. § 1924. Also noteworthy is the recognition that the "general rule" predates the 1996 addition of subsection (g). Under those circumstances, one may presume the General Assembly intended no change in prior law beyond that expressly declared. *See Commonwealth v. Miller*, 469 Pa. 24, 364 A.2d 886 (1976). Finally, interpretation of a statute by those charged with its administration and enforcement is entitled to deference, although such consideration most appropriately pertains to circumstances in which the provision is not explicit or is ambiguous. *Tritt.* Using this approach, and noting the PUC's prior exercise of "general rule" authority to approve a surcharge, the action taken by the PUC here is supportable.

In contrast stands the interpretation adopted by the majority. This approach gives no effect to the plain language of the "general rule." Also, the contention that the later addition of subsection (g) implicitly limits the breadth of the pre-existing "general rule" conflicts with the presumption that only express changes are intended. Finally, the majority's approach gives no deference to the PUC's interpretation. Because this interpretation is not consistent with these rules of statutory construction, I decline to embrace it.

### II. Case Law

The majority concludes that cases limit the breadth of the "general rule," necessitating the conclusion that as so limited it cannot authorize the surcharge here. The simple response to this conclusion is that the plain language of the "general rule" authorizes the PUC's action here. The referenced sentence fragments in prior de-

cisions do not mandate a different result. I address the prior decisions in more detail.

## A. Used and Useful

Citing *Barasch v. Pennsylvania Pub. Util. Commn. (Barasch)*, 516 Pa. 142, 532 A.2d 325 (1987), *aff'd sub nom., Duquesne Light Co. v. Barasch*, 488 U.S. 299, 109 S.Ct. 609, 102 L.Ed.2d 646 (1989), and *PIEC,* the majority concludes the recovery of capital costs through a surcharge is prohibited until the PUC determines the facility is "used and useful." Further, the majority concludes the PUC's surcharge review procedures are inadequate under various decisions.[2]

In *Masthope Rapids Prop. Owners Council v. Pennsylvania Pub. Util. Comm'n (Masthope II)*, 135 Pa.Cmwlth. 437, 581 A.2d 994 (1990), a case dealing primarily with a general rate increase, this Court also mentioned a water utility could not recover the principal and interest of a loan received under the Water Facilities Restoration Act[3] through a surcharge because Section 1307 did not provide the necessary prior review required by that statute. In doing so we discussed the nature of the PUC's review of surcharge applications:

> The automatic adjustment of public utility rates may only occur in certain limited instances.... Section 1307 has been customarily employed, for example, as the statutory predicate for the implementation of electric cost rates by certain electric utilities ... and is also employed for recovery of natural gas costs by natural gas utilities. *Further, in all such proceedings the Commission's re-view is appropriately characterized as preliminary and cursory.* Indeed, the very function of the typical automatic adjustment clause is to permit rapid recovery of a specific *identifiable* expense item, with a more comprehensive analysis upon reconciliation of actual costs with previously projected costs used to establish the effective rate. *The initial process is essentially a mathematical review of the projections provided by the public utility. Therefore, there is no initial review to determine the appropriateness or necessity of the rate request.*

*Masthope II,* 581 A.2d at 999–1000 (emphasis added; *identifiable* emphasis in original).

Our Supreme Court considered whether surcharge review procedures violated due process protections in *Allegheny Ludlum Steel Corp. v. Pennsylvania Pub. Util. Comm'n,* 501 Pa. 71, 459 A.2d 1218 (1983). Citing Section 1307(e) of the Code, 66 Pa. C.S. § 1307(e), the Court considered the required, subsequent, year-end automatic proceeding for final determination and adjustment of surcharge increases allowing full participation of all parties, and requiring refunds of overpayments with interest at the prevailing rate. It also recognized the legislature's determination that automatic rate adjustments serve the important governmental interest of maintaining a just and reasonable return so as to preserve modern, efficient, and dependable public utility service. In addition, restrictions on PUC discretion were considered. Finally, the Court distinguished the public utility surcharge process from the disapproved "deeming" of "private" interest

---

**2.** *Allegheny Ludlum Steel Corp. v. Pennsylvania Pub. Util. Comm'n,* 501 Pa. 71, 459 A.2d 1218 (1983); *Masthope Rapids Prop. Owners Council v. Pennsylvania Pub. Util. Comm'n (Masthope II),* 135 Pa.Cmwlth. 437, 581 A.2d 994 (1990); *National Fuel Gas Distrib. Corp. v. Pennsylvania Pub. Util. Comm'n,* 81 Pa. Cmwlth. 148, 473 A.2d 1109 (1984).

**3.** 32 Pa.C.S. §§ 7501–7518.

proposals into effect. It concluded the surcharge rate-setting process not to be violative of procedural due process.

I agree that a "used and useful" analysis is necessary for surcharge recovery of costs of new facilities. *PIEC; see Barasch.* Any analysis, however, is undertaken within the confines of the current application. Under the surcharge here proposed, eligible investment consists of property installed to replace existing, functioning facilities and capitalized rehabilitation work done on existing facilities. I presume a used and useful analysis was initially undertaken when the facilities were new, a presumption unchallenged here. Further, the eligible replacement property must actually be in service for at least a month to qualify for recovery. Also, the proposal incorporates the statutory limitations set forth for water distribution system improvement projects. This incorporation effectively restricts the PUC's discretion in a manner consistent with the legislatively guided formula for similar capital projects.

In my view, the current review procedure comports with precedent, because various reviews verify the used and useful nature of the replacement expenditures. First, in the current proceedings extensive information about the public health basis for replacement was received. Second, relevant information is updated quarterly and submitted to the PUC and interested parties at least 10 days before approval. Reproduced Record (R.R.) at 11a, 342a. Third, compliance with the limitations of eligible replacement property is subject to comprehensive audits at regular intervals. R.R. at 344a. Fourth, the required, automatic year-end inclusive proceedings referenced with approval by our Supreme Court in *Allegheny Ludlum Steel* exist.

This court is not free to substitute its discretion for the discretion properly exercised by the PUC in establishing the surcharge method. *PIEC.* Given the limitations on eligible property and the multiple reviews including all interested parties, I discern no relevant conflict between prior decisions and the PUC approval here.

Nothing in *PIEC* compels a different conclusion. That case involved a challenge to surcharge for costs of a mandated program for conservation of electricity. Capital costs were not at issue. We essentially affirmed the surcharge for recovery of the costs. In doing so we observed that "in the unlikely event that [conservation] programs require new physical facilities, those costs should be raised in a base rate case only." *Id.* at 1347. That observation reflected explicit statutory limits on recovery of costs for electric utilities. 66 Pa.C.S. § 1315; *PIEC,* 653 A.2d at 1346–47. The case does not address costs for replacement and rehabilitation of parts of existing, functioning wastewater facilities, as are at issue here.

## B. Traditional Rate–Making

The majority opinion questions whether the surcharge represents a disassembling of traditional rate-making contrary to this Court's caution in *PIEC.* The majority suggests a surcharge for the type of capital costs routinely claimed in base rate proceedings violates the test year concept or "matching principle" of traditional rate-making. It also suggests that the surcharge cap of 5% may result in an increase meeting the statutory definition of a "general rate increase," which requires the detailed review of a base rate proceeding.

The PUC concluded the surcharge will not "disassemble" traditional rate-making because it is tailored to recover clearly defined costs for specific, narrow categories of plant and is capped at 5%. PUC Adjudication at 14. Finally, the PUC observed that investment in property eligible

for the proposed surcharge is typically not contested in base rate proceedings, thus making the issue one of the timing of cost recovery. *Id.*

The relationship between surcharges and general rate increases is not fully explained in the Code. Under the statutory language there may be surcharges of such amount as may also qualify as general rate increases. As previously discussed, the "general rule" permits approval of surcharges without limit on amount. Other subsections of Section 1307 specifically authorize fuel cost adjustments and recovery of natural gas costs without limit in relation to the public utility's revenue. 66 Pa.C.S. § 1307(c), (f). Also, subsection (g) specifically authorizes surcharge without limit on amount to recover costs very similar to those proposed here. 66 Pa.C.S. § 1307(g). In contrast, Section 1308(d) of the Code describes the procedures for a general rate increase, defined as "a tariff filing which affects more than 5% of the customers and amounts to in excess of 3% of the total gross annual intrastate operating revenues of the public utility."

Pennsylvania appellate courts exercise caution in comparing the methods of setting rates. For example, in *PIEC*, this Court considered the propriety of a surcharge to recover electricity conservation program expenses. While essentially affirming the surcharge, we stated:

> *Although we agree that Section 1307 should have limited application and the PUC should not use it to disassemble the traditional rate-making process, the General Assembly did not limit the allowance of automatic adjustment to only fuel costs and taxes which are generally beyond the control of the utility.* Instead, the General Assembly specifically allowed the recovery of fuel costs and also allowed the PUC or the utilities to initiate the automatic adjustment of

costs within specific procedures.... Because Section 1319 directs the PUC to allow recovery of all prudent and reasonable costs for developing, managing, financing and operating [electricity conservation] programs and because Section 1307 gives the PUC the discretion to establish by either regulations or order the manner in which automatic adjustment recovery may be instituted and when such automatic adjustment of rates should be mandated, the surcharge method is permitted.

*PIEC*, 653 A.2d at 1349 (emphasis added). In *Allegheny Ludlum Steel* our Supreme Court affirmed a surcharge for fuel cost recovery, observing that its purpose "is to provide an automatic mechanism enabling utilities to recover specific energy costs not covered by general rates...." 501 Pa. at 75, n. 3, 459 A.2d at 1220, n. 3. Significantly, in each case, approval of surcharge was affirmed.

After these cases the General Assembly added Section 1307(g) of the Code. That subsection authorizes surcharge recovery of a class of costs also recoverable in base rate proceedings as investment in property.

I do not now attempt to further define the relationship between surcharges and general rate increases beyond acknowledging the potential for overlap and acknowledging the statutory scheme of reposing discretion in the PUC to determine when to approve a surcharge. As there is neither a specific statutory provision nor a controlling case prohibiting a surcharge similar to the current proposal, I discern no error of law in the PUC's action here.

Regarding the potential for surcharge increase which meets the definition of "general rate increase," I recognize the hypothetical possibility. However, as the General Assembly declined to place limits on the amounts of surcharges approved, I

see no legal error in the 5% limit on the surcharge here.

For all the foregoing reasons, I reject the conclusion that cases so limit the breadth of the "general rule" that it cannot authorize the surcharge here. I would affirm the PUC.

President Judge COLINS joins in this dissent.